VIRGINIA T. FERNANDEZ, ROMAN P. FERNANDEZ, JR., EVELYN FERNANDEZ AND ALLEN FERNANDEZ, SOLE HEIRS OF ROMAN P. FERNANDEZ, DECEDENT, APPELLANTS, v. WILLIAM H. ADMIRAND, M.D. AND MICHAEL K. DAINES, M.D., RESPONDENTS.

No. 21620

December 3, 1992                    843 P.2d 354

*Peter J. Sferrazza,* Reno, for Appellants.

*Eugene J. Wait, Jr.,* Reno, for Respondent Admirand.

*Osborne & Gamboa,* Reno, for Respondent Daines.

## OPINION

*Per Curiam:*

### Facts

In June, 1983, Roman P. Fernandez (Fernandez) first sought medical treatment from Michael K. Daines, M.D. (Dr. Daines), a physician who was board certified in internal medicine. Fernandez was a forty-nine year old Filipino male with a three-year history of peptic ulcer disease and gastrointestinal (G.I.) bleeding.

On January 24, 1984, Fernandez returned to Dr. Daines and told him that, when he had a bowel movement, he had black, tarry stools along with bright red blood. That same day, Dr. Daines had Fernandez admitted to St. Mary's Hospital, and the nursing progress notes indicated that Fernandez reported having a

"reddish stool" that morning and the day before. The presence of black, tarry stools indicates upper G.I. blood loss which is often associated with an active ulcer. The black color—referred to as melena—can only occur when the blood contacts acids which are found in the upper intestinal tract. On the other hand, the presence of red blood in a patient's stool indicates a source of bleeding in the lower G.I. tract, a symptom of colon cancer.

Although Fernandez's stool was maroon, Dr. Daines diagnosed it as having been formed by a bleeding ulcer from the upper G.I. tract. For confirmation, Dr. Daines consulted with Dr. Admirand, a specialist in internal medicine with a board certified subspecialty in gastroenterology. At the hospital on the same day, Dr. Admirand examined Fernandez's upper G.I. tract with an endoscope, an instrument for visual inspection of the inside of a hollow organ of the body, which showed a benign-appearing, deep duodenal ulcer that was not bleeding. Dr. Admirand did not normally review the nurse's notes before performing any procedure, and he had no recollection of reviewing the notes prior to performing the endoscopy on Fernandez.

Dr. Daines' progress notes for January 24, 1984, show "black tarry stools along with bright red blood." Although the presence of bright red blood in stools indicates colon cancer in the lower G.I. tract, neither of the respondents ordered or performed any procedures to examine the lower G.I. tract. On March 2, 1984, Dr. Daines asked Dr. Admirand to perform a follow-up endoscopy to determine the condition of the ulceration, and the endoscopy confirmed that the ulcer had healed. Five months later, on August 7, 1984, Fernandez was admitted to the emergency room at St. Mary's Hospital, where he reported melena for the preceding four days. In his report after the rectal examination, Dr. Daines wrote, "No masses. Stool is maroon and strongly positive for occult blood."[1]

Dr. Admirand performed another endoscopic examination of Fernandez on August 8, 1984, and found a small ulceration but no bleeding. Once again, no doctor examined the lower G.I. tract. During his hospital stay, Fernandez's stools returned to a normal brown color. After discussion of the possibility of ulcer surgery with Fernandez, Dr. Daines and Dr. Admirand decided that if there were another episode of G.I. bleeding or failure of the ulcer to heal, the next step would be surgery on the ulcer. Fernandez was released from the hospital on August 10, 1984, and did not see Dr. Daines again. On September 4, 1984, Fernandez returned to see Dr. Admirand for the last time, for a follow-

---

[1] "Occult blood" is blood in the feces in amounts too small to be seen but detectable by chemical tests.

up endoscopic exam. Dr. Admirand's post-operative diagnosis stated that the previous ulcer had healed.

More than three months later, on December 20, 1984, Fernandez consulted Leandro M. Queniahan, M.D. (Dr. Queniahan), a surgeon, and complained of back pain resulting from a fall at work. At trial, Dr. Queniahan denied that Fernandez complained about his ulcer during this visit. Dr. Schultz, a surgeon, saw Fernandez on March 29, 1985, and recognized signs of colon cancer in the bright red blood as well as in the figures for hemoglobin and hematocrit,[2] so he arranged for an examination with a sigmoidoscope and a barium enema. Fernandez did not appear for the confirmatory diagnostic examination, but on April 3, 1985, he returned to Dr. Queniahan and reported the same symptoms. Dr. Queniahan decided to perform surgery. While performing the ulcer surgery on April 15, 1985, Dr. Queniahan identified a cyst on Fernandez's liver and sent it to the laboratory for a biopsy. The laboratory analysis revealed colon cancer that had advanced to the level of Duke's D, which meant that statistically Fernandez had a five year survival rate of approximately fourteen percent. This was fifteen months after Fernandez first told Dr. Daines about blood in his stools. At trial, a doctor testified that the tumor must have begun by 1983 or before, and that if the cancer had been discovered when Fernandez first told Dr. Daines about blood in his stools, Fernandez's five year survival rate would have been approximately sixty-seven percent, an increase of fifty-three percent over the survival rate fifteen months later.

On October 17, 1986, Fernandez died of complications from his colon cancer. The original medical malpractice action was filed on December 31, 1985, prior to Fernandez's death, against Dr. Admirand and Dr. Daines. On January 1, 1986, a new Nevada statute went into effect that required the review of medical malpractice actions by a medical screening panel before a cause of action could be filed.[3] On November 16, 1987, Fernandez's heirs (the heirs) filed an action for wrongful death before the medical screening panel. The panel was unaware that the presence of red blood was indicated in Fernandez's stool on January 24, 1984 and August 7, 1984. On April 22, 1988, the heirs substituted themselves as party plaintiffs in place of Fernandez. On September 8, 1988, the medical screening panel found that there was no reasonable probability of medical malpractice by Dr. Daines and Dr. Admirand.

---

[2]Hematocrit is "the proportion of red blood cells to a volume of blood." Webster's New World Dictionary (3d college ed. 1989).

[3]A.B. 696, 63rd Leg., 1985 Nevada Laws 2009, 2013. *See* NRS 41A.016.

On August 18, 1989, the heirs filed a second amended complaint, and a jury trial was held from July 16 to July 20, 1990. On July 20 and 31, 1990, the district court entered orders pursuant to NRCP 41(b) that dismissed the cause of action for failure to prove a sufficient case for the jury. On August 17, 1990, the heirs filed a notice of appeal. In two orders, both dated August 27, 1990, the court awarded attorney's fees of $46,218.00 and costs of $5,828.29 to Dr. Daines, and awarded $82,355.00 in attorney's fees and costs of $8,614.54 to Dr. Admirand. In a second amended designation of the record on appeal filed on August 30, 1990, the heirs designated the orders that were filed on August 27, 1990. In an amended notice of appeal filed on October 22, 1990, the heirs appealed the awards of attorney's fees and costs. On November 15, 1990, against opposition from the heirs, the district court ordered that the entire trial transcript be included in the record on appeal.

## Discussion

### Standard of Review

NRCP 41(b) provides that the defendant "may move for a dismissal on the ground that upon the facts and the law the plaintiff has failed to prove a sufficient case for the court or jury." Because the heirs appeal from a dismissal pursuant to NRCP 41(b), respondents' motion for involuntary dismissal admits the truth of appellants' evidence and all inferences that can reasonably be drawn therefrom, and the evidence must be interpreted in the light most favorable to the appellants and most strongly against the respondents. Vancheri v. GNLV Corp., 105 Nev. 417, 420, 777 P.2d 366, 368 (1989); Corn v. French, 71 Nev. 280, 289 P.2d 173 (1955). "To defeat a 41(b) motion the plaintiff must have presented a prima facie case upon which the trier of fact can grant relief." Nevada Industrial Dev. v. Benedetti, 103 Nev. 360, 362-63, 741 P.2d 802, 804 (1987). A prima facie case is "sufficiency of evidence in order to send the question to the jury." *Vancheri,* 105 Nev. at 420, 777 P.2d at 368. The credibility of the witnesses and the weight of the evidence are immaterial to the presentation of a prima facie case. *Id.*

NRS 41A.009 defines medical malpractice as "the failure of a physician, hospital or employee of a hospital, in rendering services, to use the reasonable care, skill or knowledge ordinarily used under similar circumstances." To prove medical malpractice, the appellants must first establish the accepted standard of medical care or practice, and then must show that the doctors'

conduct departed from that standard and legally caused the injuries suffered. Orcutt v. Miller, 95 Nev. 408, 411, 595 P.2d 1191, 1193 (1979); *see* NRS 41A.100;[4] Beattie v. Thomas, 99 Nev. 579, 584, 668 P.2d 268, 271-72 (1983); Stevens v. Duxbury, 97 Nev. 517, 634 P.2d 1212 (1981).

## *Medical Testimony to Establish Standard of Care*

This court has recognized the general rule that expert testimony must be used to establish medical malpractice, unless the propriety of the treatment, or the lack of it, is a matter of common knowledge of laymen. *See* NRS 41A.100(1); *Beattie,* 99 Nev. at 584, 668 P.2d at 271; *Stevens,* 97 Nev. at 519, 634 P.2d at 1214; *Orcutt,* 95 Nev. at 414, 595 P.2d at 1195; Corn v. French, 71 Nev. 280, 294, 289 P.2d 173, 180 (1955). Dr. Queniahan, a surgeon, and Dr. Tripoli, a pathologist, testified for Fernandez in his case-in-chief. Neither practiced as specialists in internal medicine. Dr. Admirand and Dr. Daines assert that neither of these doctors can testify to the standard of care for their specialty, internal medicine.

Once a physician is qualified as an expert, he or she may testify to all matters within his or her experience or training, and the expert is generally given reasonably wide latitude in the opinions and conclusions he or she can state, being subject only to the general exercise of discretion by the district court concerning whether the expert is truly qualified to render such testimony. *See* NRS 50.275;[5] Brown v. Capanna, 105 Nev. 665, 671, 782 P.2d 1299, 1303 (1989) (a proposed medical expert should not be scrutinized by an excessively strict test of qualifications); Freeman v. Davidson, 105 Nev. 13, 15, 768 P.2d 885, 886 (1989) ("[a]n expert witness need not be licensed to testify as an expert,

---

[4]NRS 41A.100(1) provides in part:

Liability for personal injury or death is not imposed upon any provider of medical care based on alleged negligence in the performance of that care unless evidence consisting of expert medical testimony, material from recognized medical texts or treatises or the regulations of the licensed medical facility wherein the alleged negligence occurred is presented to demonstrate the alleged deviation from the accepted standard of care in the specific circumstances of the case and to prove causation of the alleged personal injury or death.

[5]NRS 50.275 provides:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by special knowledge, skill, experience, training or education may testify to matters within the scope of such knowledge.

as long as he or she possesses special knowledge, training and education, or in this case, knowledge of the standard of care"); Wright v. Las Vegas Hacienda, 102 Nev. 261, 263, 720 P.2d 696, 697 (1986) ("[a] witness need not be licensed to practice in a given field . . . to be qualified to testify as an expert").

Within the field of medicine, many matters are common knowledge to all physicians and recognized as truisms by the medical profession. This would include such things as pain in the lower right quadrant, coupled with loss of appetite and a low grade fever, as indicative of appendicitis. The recognition of red blood bleeding from the rectum as an indication of potential colon cancer is something within the ken of all physicians. Dr. Queniahan made this clear in his testimony:

> Q  Dr. Queniahan, are medical doctors trained to recognize symptoms and specifically with respect to the GI bleeding?
> A  Yes.
> Q  Is that true for all medical doctors?
> A  Yes.

Dr. Tripoli, a pathologist, supported this position:

> Q  And what I'm asking you about, is that something that is common knowledge to all physicians?
> A  [Dr. Tripoli] As a medical doctor, and in my training as a physician in medical school, we are made aware that it is a concern when a patient has red blood at the rectum or in the stool, it is a concern for a very serious condition that can be treatable if caught early enough . . . .

Admittedly, some diagnoses or operational procedures are unique to a medical specialty, and only a specialist in that medical area would be able to testify to the standard of care to be met. This is not the case with the diagnosis for bright red blood bleeding from the rectum.

The heirs produced evidence that the appropriate standard of care for the diagnosis and treatment of a male over fifty years of age with suspected lower G.I. bleeding is a colonoscopy, a sigmoidoscopy, and a barium enema. These procedures ascertain whether the patient is suffering from colorectal cancer. Dr. Queniahan testified that the use of screening to detect colon cancer was recommended by the medical profession in 1982 and was a method that all medical doctors should have known about in 1984. In his own testimony, Dr. Daines criticized a doctor for failure to order a lower G.I. diagnostic workup when the stool had bright red blood, and Dr. Daines noted that Dr. Schultz determined that a sigmoidoscopy and a barium enema should have been performed when Dr. Schultz found a trace of maroon-

colored blood on his examining glove. Dr. Queniahan testified that two lesions can co-exist, and that when a patient has rectal bleeding, the doctor should investigate the condition with an anoscopy, a sigmoidoscopy, and a barium enema. Thus, we conclude that the heirs presented sufficient evidence to establish the standard of care, concerning the recognition of bright red blood as an indication of colon cancer and the steps necessary to diagnose it.

*Breach of the Standard of Care by Dr. Daines*

Fernandez advised Dr. Daines on January 24, 1984, that he had bright red blood along with his black, tarry stools. In addition, the nursing notes for the same date indicated that Fernandez had reddish stools, and Dr. Tripoli testified that a physician should review a nurse's notes. Dr. Daines' progress notes for that date showed "black tarry stools along with bright red blood." Finally, Dr. Daines' report of August 7, 1984, stated, "No masses. Stool is maroon and strongly positive for occult blood." Thus, the heirs presented evidence that Dr. Daines was aware of blood in the stool.

The heirs also presented evidence that blood in the stool signifies the presence of colon cancer. Dr. Tripoli testified that red blood in a stool is a symptom of colon cancer. Dr. Daines himself criticized Dr. Queniahan's treatment of Fernandez because Dr. Queniahan failed to do lower G.I. diagnostic work when there was bright red blood in the stools. Dr. Daines neither performed nor requested any lower G.I. studies on behalf of Fernandez. His own testimony indicated that a lower G.I. workup was appropriate due to the presence of bright red blood in the stools.

Drs. Daines and Admirand assert that no physician testified that if an anoscopy, a sigmoidoscopy, or a barium enema had been performed on Fernandez in January, 1984, the cancerous lesion in his colon would have been detected. A few well-phrased questions at trial by Fernandez's attorney would have removed any doubt about the ability of a physician to detect such a condition at that time. But even without those questions and responses, there is sufficient evidence in the record to permit us to draw the reasonable inference that the colon cancer would have, in all probability, been detectible in 1984.

Dr. Koldinger testified that colon cancer is common and is readily diagnosed by barium enema or colonoscope or both:

> Q Can you tell me what diagnostic tool was used to confirm that a lesion existed in the colon in this case from your review of the records?

A  Yes. That was in, I think, April of 1985 and it was—the lesion in the colon was demonstrated on a barium enema.

Q  So, in this particular case, barium enema was sufficient to diagnose the—

A  The colon cancer, yes.

. . . .

Q  . . . "Neoplasms do not often produce exsanguinating hemorrhage but rather tend to present with chronic occult bleeding or with intermittent bouts of acute, self-limited bleeding. Small bowel tumors are rare and relatively inaccessible. Arteriograph is needed in many cases. Colon cancer is common and is readily diagnosed by barium enema or colonoscope or both."

Do you agree with that statement?

A  Yes.

Dr. Queniahan testified that a barium enema ultimately was used to detect the colon cancer and was available and in use in January, 1984:

Q  In fact, what diagnostic tool in this particular case was used to diagnose the colon cancer?

A  It was a proctosigmoidoscopy and a barium enema. The barium enema confirmed that there was a lesion.

Q  And they did have [a] barium enema on January 24, 1984?

A  I'm sure that's available. . . .

Consequently, we conclude that the heirs presented sufficient evidence to show breach of the standard of care.

*Legal Cause of Damage to Fernandez*

To show that the actual cause of death was colon cancer, the heirs produced the death certificate, which listed colon cancer as the cause of death. However, a prima facie case of medical malpractice is not demonstrated upon the presentation of evidence that a patient died after a doctor breached an established standard of care. The heirs also had to show that Dr. Daines' conduct was the legal cause of Fernandez's death. In Sims v. General Telephone & Electric, 107 Nev. 516, 524-25, 815 P.2d 151, 156 (1991), this court stated that "[e]ven where it has been established that defendant's conduct has been one of the causes of plaintiff's injury, there remains the question of whether defendant will be legally responsible for the injury," the main consideration in such circumstances being foreseeability. The standard in a medical case concerning the causation of death is "reasonable

medical probability." Perez v. Las Vegas Medical Center, 107 Nev. 1, 6, 805 P.2d 589, 592 (1991). *See* Brown v. Capanna, 105 Nev. 665, 671-72, 782 P.2d 1299, 1304 (1989).

The heirs presented testimony that to a "reasonable medical certainty" the colon cancer was at Duke's C in 1984, when Dr. Daines had the opportunity to discover it, and that Duke's C has a "five-year predicted survival rate of approximately sixty-seven percent." When the cancer was finally discovered on April 15, 1985, it had advanced to Duke's D, where patients have a five-year predicted survival rate of only fourteen percent, a reduction of fifty-three percent. Thus, the heirs showed that Dr. Daines' omissions had the foreseeable consequence to a reasonable medical probability of substantially reducing Fernandez's chances of survival; and that he probably died from the cancer because he had only a fourteen percent chance of surviving the cancer once it was discovered. Viewed in the light most favorable to the heirs, a reasonable inference from these facts is that Dr. Daines' negligence substantially diminished Fernandez's chances of survival and was the legal cause of Fernandez's death.

## *The Standard of Care Concerning Dr. Admirand*

Dr. Admirand attempts to disclaim responsibility for the treatment of Fernandez on the basis that he was a consulting physician whose only task was to perform an endoscopy examination. He claims he had no knowledge that Fernandez was discharging red blood from his rectum. But as previously noted, Dr. Tripoli testified that a physician should review the nurse's notes, and he did not limit this observation to the primary treating physician. Since reasonable inferences must be drawn in Fernandez's favor, the evidence suggests that Dr. Admirand should have reviewed the patient's history or taken one himself. A physician should be observant and seek all relevant information when treating a patient. Furthermore, Dr. Daines' testimony contradicts Dr. Admirand's position that he was to perform only an endoscopy because Dr. Daines testified that, after consultation with Dr. Admirand, they agreed on a particular medication for Fernandez. The doctors also agreed that one more trial of medication would be used before resorting to surgery.

During his deposition, Dr. Admirand stated that it was impossible to have bright red blood and black tarry stools. However, at trial he testified that such a condition is possible. Although Dr. Admirand claimed that this condition is consistent with upper G.I. bleeding, other testimony asserted that it was consistent with colon cancer, which is a lower G.I. condition. A jury could

reasonably infer from Dr. Admirand's contradictory testimony that he had learned or remembered additional facts about this medical condition between the time of his deposition and the time of trial, and that he had neglected to order additional tests to be performed on Fernandez because of his ignorance or forgetfulness of some commonly known medical facts.

Thus, with all inferences made in favor of Fernandez, we conclude that Dr. Admirand should have found that Fernandez was bleeding from the rectum, and Dr. Admirand's duties at that time included more than the performance of an endoscopy examination.

Dr. Admirand claims that the heirs did not establish a standard of care for him because no gastroenterologist testified to the appropriate standard of care. As discussed with respect to Dr. Daines, however, the standard of care when a patient is discharging bright red blood from his rectum is common knowledge to all physicians. Likewise, the breach of the standard of care follows our reasoning in discussing Dr. Daines' performance. With all factual inferences made in favor of Fernandez, there is sufficient evidence to establish the standard of care for Dr. Admirand and that his conduct fell below it in his consultation on the Fernandez case.

*Designation of the Entire Record on Appeal*

Against opposition from the heirs, the district court ordered that the entire record be designated the record on appeal. The primary issue on appeal is whether evidence in the record could support a finding by the jury that the doctors committed medical malpractice. Only those portions of the transcript that are essential to the questions on appeal need be designated. NRAP 10(f)(1) states: "Except as otherwise herein required, all matters not essential to the decision of issues presented by the appeal shall be omitted. Brevity of the record is encouraged; and the court may impose costs upon parties or attorneys who unnecessarily enlarge the record on appeal." In Beattie v. Thomas, 99 Nev. 579, 589, 668 P.2d 268, 274 (1983), this court stated: "NRAP 10 does not invest the party who prevailed in the lower court with the unqualified right to require the appellant to file a full trial transcript." In *Beattie,* this court noted that the appellant has a duty to omit from the record on appeal all non-essential material, and further stated that: "We hold that the district court erred in requiring appellant to bear the cost of adding the requested portions of transcript." *Id.* at 589, 668 P.2d at 275. *See* Driscoll v. Erreguible, 87 Nev. 97, 482 P.2d 291 (1971) (appellant has a duty to omit all matter

from transcript not essential to decision of questions presented on appeal).

On review of a dismissal pursuant to NRCP 41(b) in a medical malpractice case, this court does not weigh the evidence of medical malpractice versus the evidence of no medical malpractice. Instead, we search the record to determine whether the evidence most favorable to the plaintiff is sufficient to establish medical malpractice. Therefore, we conclude that under NRAP 10 and *Beattie* the heirs were obligated to transmit only those portions of the record that they considered necessary and relevant, and that they should not have been required to pay for transmission of portions that were unnecessary and irrelevant, including direct testimony by witnesses for the defense and the arguments by counsel. Further, since an NRCP 41(b) motion requires the court to consider the evidence in a light most favorable to the non-moving party, it is irrelevant for the purpose of this review whether other portions of the record favor the defense. Consequently, we conclude that it was improper for the respondents to require the heirs to file and pay for a full trial transcript. Therefore, we conclude that the respondents should be required to reimburse the heirs for the costs of the additional transcripts.

## Conclusion

For the reasons stated above, we conclude the heirs presented a prima facie case against both doctors and the district court erroneously dismissed the case pursuant to NRCP 41(b). We therefore reverse and remand to the district court for a new trial. Since we reverse and remand, we do not reach the heirs' other contentions of error with respect to the trial and the involuntary dismissal. Because the heirs made a prima facie case, we hereby vacate the awards of attorney's fees and costs to both doctors. Finally, the district court shall order the reimbursement of the appellants' costs of the additional, unnecessary transcripts of the record on appeal.[6]

---

[6]THE HONORABLE THOMAS L. STEFFEN, Justice, voluntarily recused himself from participation in the decision of this appeal.