SUNDI A. GRECO, INDIVIDUALLY, AND AS MOTHER AND NEXT FRIEND OF JOSHUA GRECO, APPELLANT, *v.* UNITED STATES OF AMERICA, RESPONDENT.

No. 24587

March 30, 1995                                     893 P.2d 345

*Jack H. Olender* and *Harlow R. Case,* Washington, D.C.; *Hamilton & Lynch,* Reno, for Appellant.

*Gary P. Jordon,* U.S. Attorney, *Jeanette Plante,* Assistant U.S. Attorney, *Donna C. Sanger,* Assistant U.S. Attorney, District of Maryland, Baltimore, Maryland, for Respondent.

*Bradley & Drendel* and *Thomas E. Drendel,* Reno, for Amicus Curiae Nevada Trial Lawyers Association.

## OPINION

By the Court, SPRINGER, J.:

In this case we certify to the United States District Court for the District of Maryland that a mother has a tort claim in negligent malpractice against professionals who negligently fail to make a timely diagnosis of gross and disabling fetal defects, thereby denying the mother her right to terminate the pregnancy. We further certify that the child born to this mother has no personal cause of action for what is sometimes called "wrongful life."

As Justice Felix Frankfurter observed, "[P]erhaps no field of the law comes closer to the lives of so many families in this country than does the law of negligence . . . ." Tiller v. Atlantic Coast Line R.R., Co., 318 U.S. 54, 73 (1943). Today it is the Greco family whom the law of negligence touches. The first question before this court is whether Nevada's common law of negligence offers relief to the mother of a child born with severe deformities whose physicians' negligence caused the mother to remain ignorant of the fact that she was carrying a severely deformed fetus. We answer this question in the affirmative. The second question before the court is whether Sundi Greco's disabled child has any enforceable legal claims arising out of the child's being born with congenital defects. We answer this question in the negative.

In July 1989, appellant,[1] Sundi A. Greco, mother of co-appellant Joshua Greco, ("Joshua") filed suit individually, and on Joshua's behalf, against respondent, the United States of America. Sundi Greco and Joshua alleged that Sundi Greco's doctors at the Nellis Air Force Base in Nevada committed several acts of negligence in connection with Sundi Greco's prenatal care

---

[1]The United States District Court has designated the plaintiffs in the underlying action as appellants in this action. The United States will be referred throughout as respondent. The Nevada Trial Lawyers Association ("NTLA") filed a brief with this court as amicus curiae.

and delivery and that, as a result, both Sundi and Joshua are entitled to recover money damages.[2] The United States moved to dismiss the suit on the ground that the complaint failed to state a cause of action.

On July 20, 1993, the United States District Court for the District of Maryland filed a certification order with this court pursuant to NRAP 5,[3] requesting that this court answer certain questions relating to the negligently caused unwanted birth of a child suffering from birth defects.

The Grecos, mother and child, in this case seek to recover damages from the United States arising out of the negligence of physicians who, they claim, negligently failed to make a timely diagnosis of physical defects and anomalies afflicting the child when it was still in the mother's womb. Sundi Greco asserts that the physicians' negligence denied her the opportunity to terminate her pregnancy and thereby caused damages attendant to the avoidable birth of an unwanted and severely deformed child. On Joshua's behalf, Sundi Greco avers that the physicians' negligence and the resultant denial of Joshua's mother's right to terminate her pregnancy caused Joshua to be born into a grossly abnormal life of pain and deprivation.

These kinds of tort claims have been termed "wrongful birth" when brought by a parent and "wrongful life" when brought on behalf of the child for the harm suffered by being born deformed.

## THE CHILD'S CAUSE OF ACTION: "WRONGFUL LIFE"

We decline to recognize any action by a child for defects claimed to have been caused to the child by negligent diagnosis or treatment of the child's mother. The Grecos' argument is condi-

---

[3]NRAP 5(a) provides:

The Supreme Court may answer questions of law certified to it by the Supreme Court of the United States, a Court of Appeals of the United States, or of the District of Columbia, or a United States District Court, when requested by the certifying court, if there are involved in any proceeding before those courts questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court of this state.

[2]According to the facts as certified by the United States District Court, Joshua "was born with congenital myelomeningocele (spina bifida). Congenital macro/hydrocephaly, bilateral talipes varus deformity, and Arnold Chiari malformation, type two. Joshua required placement of a ventriculoperitoneal shunt for hydrocephalus. He has paraplegia with no sensation from the hips down and suffers permanent fine and gross motor retardation and mental retardation."

tional and narrowly put, so: if this court does not allow Sundi Greco to recover damages for Joshua's care past the age of majority, it should allow Joshua to recover those damages by recognizing claims for "wrongful life." Implicit in this argument is the assumption that the child would be better off had he never been born. These kinds of judgments are very difficult, if not impossible, to make. Indeed, most courts considering the question have denied this cause of action for precisely this reason.[4] Recognizing this kind of claim on behalf of the child would require us to weigh the harms suffered by virtue of the child's having been born with severe handicaps against "the utter void of nonexistence"; this is a calculation the courts are incapable of performing. Gleitman v. Cosgrove, 227 A.2d 689, 692 (N.J. 1967). The New York Court of Appeals framed the problem this way:

> Whether it is better never to have been born at all than to have been born with even gross deficiencies is a mystery more properly to be left to the philosophers and the theologians. Surely the law can assert no competence to resolve the issue, particularly in view of the very nearly uniform high value which the law and mankind has placed on human life, rather than its absence.

Becker v. Schwartz, 386 N.E.2d 807, 812 (N.Y. 1978). We conclude that Nevada does not recognize a claim by a child for harms the child claims to have suffered by virtue of having been born.

### THE MOTHER'S CAUSE OF ACTION

With regard to Sundi Greco's claim against her physician for negligent diagnosis or treatment during pregnancy, we see no reason for compounding or complicating our medical malpractice jurisprudence by according this particular form of professional negligence action some special status apart from presently recognized medical malpractice or by giving it the new name of "wrongful birth."[5] Sundi Greco either does or does not state a claim for medical malpractice; and we conclude that she does.

---

[4]*See, e.g.,* Blake v. Cruz, 698 P.2d 315 (Idaho 1984); Goldberg v. Ruskin, 471 N.E.2d 530 (Ill. App. Ct. 1984); *compare* Turpin v. Sortini, 643 P.2d 954 (Cal. 1982) (in bank) (allowing child to recover special damages such as medical care but not general damages).

[5]One commentator observes that the term "wrongful life," "was a play on the statutory tort of 'wrongful death'." Alexander M. Capron, *Tort Liability in Genetic Counseling,* 79 Col. L. Rev. 618, 634 n.62 (1979). The related concepts of wrongful birth and wrongful pregnancy or conception were similarly inspired. *Id.* The commentator concludes that the net effect of these terms has been to "spawn confusion" and distort or impair judicial vision. *Id.*

Medical malpractice, like other forms of negligence, involves a breach of duty which causes injury. To be tortiously liable a physician must have departed from the accepted standard of medical care in a manner that results in injury to a patient. Fernandez v. Admirand, 108 Nev. 963, 843 P.2d 354 (1992); *see also* NRS 41A.009 (defining medical malpractice as "the failure of a physician, hospital or employee of a hospital, in rendering services, to use the reasonable care, skill or knowledge ordinarily used under similar circumstances"). In the case before us, we must accept as fact that Sundi Greco's physicians negligently failed to perform prenatal medical tests or performed or interpreted those tests in a negligent fashion and that they thereby negligently failed to discover and reveal that Sundi Greco was carrying a severely deformed fetus. As a result of such negligence Sundi Greco claims that she was denied the opportunity to terminate her pregnancy and that this denial resulted in her giving birth to a severely deformed child.

It is difficult to formulate any sound reason for denying recovery to Sundi Greco in the case at hand. Sundi Greco is saying, in effect, to her doctors:

> "If you had done what you were supposed to do, I would have known early in my pregnancy that I was carrying a severely deformed baby. I would have then terminated the pregnancy and would not have had to go through the mental and physical agony of delivering this child, nor would I have had to bear the emotional suffering attendant to the birth and nurture of the child, nor the extraordinary expense necessary to care for a child suffering from such extreme deformity and disability."

The United States advances two reasons for denying Sundi Greco's claim: first, it argues that she has suffered no injury and that, therefore, the damage element of negligent tort liability is not fulfilled; second, the United States argues that even if Sundi Greco has sustained injury and damages, the damages were not caused by her physicians. To support its first argument, the United States points out that in Szekeres v. Robinson, 102 Nev. 93, 715 P.2d 1076 (1986), this court held that the mother of a normal, healthy child could not recover in tort from a physician who negligently performed her sterilization operation because the birth of a normal, healthy child is not a legally cognizable injury.[6]

---

[6]We did observe that the mother might have a contractual remedy against the physician for failure to do what he promised to do—sterilize his patient. *Id.* at 98, 715 P.2d at 1079.

The United States argues that no distinction can be made between a mother who gives birth to a healthy child and a mother who gives birth to a child with severe deformities and that, therefore, *Szekeres* bars recovery.

*Szekeres* can be distinguished from the instant case. Unlike the birth of a normal child, the birth of a severely deformed baby of the kind described here is necessarily an unpleasant and aversive event and the cause of inordinate financial burden that would not attend the birth of a normal child. The child in this case will unavoidably and necessarily require the expenditure of extraordinary medical, therapeutic and custodial care expenses by the family, not to mention the additional reserves of physical, mental and emotional strength that will be required of all concerned. Those who do not wish to undertake the many burdens associated with the birth and continued care of such a child have the legal right, under *Roe v. Wade* and codified by the voters of this state, to terminate their pregnancies. Roe v. Wade, 410 U.S. 113 (1973); NRS 442.250 (codifying by referendum the conditions under which abortion is permitted in this state). Sundi Greco has certainly suffered money damages as a result of her physician's malpractice.

We also reject the United State's second argument that Sundi Greco's physicians did not cause any of the injuries that Sundi Greco might have suffered. We note that the mother is not claiming that her child's defects were *caused* by her physicians' negligence; rather, she claims that her physicians' negligence kept her ignorant of those defects and that it was this negligence which caused her to lose her right to choose whether to carry the child to term. The damage Sundi Greco has sustained is indeed causally related to her physicians' malpractice.

Sundi Greco's claim here can be compared to one in which a physician negligently fails to diagnose cancer in a patient. Even though the physician did not *cause* the cancer, the physician can be held liable for damages resulting from the patient's decreased opportunity to fight the cancer, and for the more extensive pain, suffering and medical treatment the patient must undergo by reason of the negligent diagnosis. *See* Perez v. Las Vegas Medical Center, 107 Nev. 1, 805 P.2d 589 (1991) (adopting the ''loss of chance'' doctrine in medical malpractice cases). The ''chance'' lost here, was Sundi Greco's legally protected right to choose whether to abort a severely deformed fetus.[7] If we were to

---

[7]The other causation-related issue before this court is contained in the following certified question from the United States District Court: What is the effect, if any, if the birth was planned and the child wanted by the parents? We conclude that whether or not the birth was planned by the parents is irrelevant to Greco's malpractice claim as presented to this court. Greco is arguing that she was denied the opportunity to choose whether to

deny Sundi Greco's claim, we would, in effect, be groundlessly excepting one type of medical malpractice from negligence liability. We see no reason to treat this case any differently from any other medical malpractice case. Sundi Greco has stated a prima facie claim of medical malpractice under Nevada law.

## DAMAGE ISSUES

The certified question requires us to decide specifically what types of damages the mother may recover if she succeeds in proving her claim. Courts in these cases have struggled with what items of damages are recoverable because, unlike the typical malpractice claim, claims such as Sundi Greco's do not involve a physical injury to the patient's person. We consider each of Sundi Greco's claimed items of damage separately.

### Extraordinary medical and custodial expenses

This claim for damages relates to the medical, therapeutic and custodial costs associated with caring for a severely handicapped child. There is nothing exceptional in allowing this item of damage. It is a recognized principle of tort law to "afford compensation for injuries sustained by one person as the result of the conduct of another." W. Page Keeton, *et al., Prosser and Keeton on the Law of Torts,* § 2 at 6 (5th ed. 1984); *see* K Mart Corp. v. Ponsock, 103 Nev. 39, 49, 732 P.2d 1364, 1371 (1987) (tort damages serve to make injured party "whole"). Extraordinary care expenses are a foreseeable result of the negligence alleged in this case, and Sundi Greco should be allowed to recover those expenses if she can prove them. This leads us to the question of how to compensate for these kinds of injuries.

Sundi Greco correctly observes that Nevada law requires the parents of a handicapped child to support that child beyond the age of majority if the child cannot support itself. NRS 125B.110; *see, e.g.,* Minnear v. Minnear, 107 Nev. 495, 814 P.2d 85 (1991). Nevada recognizes the right of a parent to recover from a tortfeasor any expenses the parent was required to pay because of the injury to his or her minor child. Frances v. Plaza Pacific

---

terminate her pregnancy. Whether the pregnancy was planned or not, she had the right to terminate that pregnancy within the parameters set forth in *Roe v. Wade* and codified by the voters of this state. Whether the mother may have "wanted" the child, despite its infirmities, is a factual issue for the trier of fact. Obviously, if the mother would have elected to have the baby, notwithstanding its condition, she would suffer no damage from the loss of the opportunity to terminate the pregnancy.

Equities, 109 Nev. 91, 847 P.2d 722 (1993). Accordingly, Sundi Greco claims the right to recover damages for these extraordinary costs for a period equal to Joshua's life expectancy. Other states which require parents to care for handicapped children past the age of majority allow plaintiffs to recover these types of damages for the lifetime of the child or until such time as the child is no longer dependent on her or his parents.[8] We agree with these authorities and conclude that Sundi Greco may recover extraordinary medical and custodial expenses associated with caring for Joshua for whatever period of time it is established that Joshua will be dependent upon her to provide such care.

The United States contends that if this court allows the mother to recover such extraordinary medical and custodial expenses, then it should require the district court to offset any such award by the amount it would cost to raise a non-handicapped child. To do otherwise, argues the United States, would be to grant the mother a windfall. *See, e.g.,* Smith v. Cote, 513 A.2d 341, 349-50 (N.H. 1986) (adopting offset rule).

The offset rule has its origins in two doctrines: the "avoidable consequences rule," which requires plaintiffs to mitigate their damages in tort cases, and the expectancy rule of damages employed in contract cases, which seeks to place the plaintiff in the position he or she would have been in had the contract been performed. *Smith,* 513 A.2d at 349. We conclude that neither of these doctrines is applicable to the case at bar. To enforce the "avoidable consequences" rule in the instant case would impose unreasonable burdens upon the mother such as, perhaps, putting Joshua up for adoption or otherwise seeking to terminate her parental obligations. *See* Norman M. Block, *Note, Wrongful Birth: The Avoidance of Consequences Doctrine in Mitigation of Damages,* 53 Fordham L. Rev. 1107 (1985).

With regard to the expectancy rule, it would unnecessarily complicate and limit recovery for patients in other malpractice cases if we were to begin intruding contract damage principles upon our malpractice jurisprudence. The rule for compensatory damages in negligence cases is clear and workable, and we decline to depart from it.

---

[8]*See* Robak v. United States, 658 F.2d 471, 478 (7th Cir. 1981) (applying Alabama law); Phillips v. United States, 575 F. Supp. 1309, 1317 (D.S.C. 1983); Lininger v. Eisenbaum, 764 P.2d 1202, 1207 n.8 (Colo. 1988); Garrison v. Med. Center of Delaware, Inc., 581 A.2d 288, 292 (Del. 1989); Blake v. Cruz, 698 P.2d 315, 321 (Idaho 1984); Viccaro v. Milunsky, 551 N.E.2d 8, 11 (Mass. 1990); Smith v. Cote, 513 A.2d 341, 350 (N.H. 1986); James G. v. Caserta, 332 S.E.2d 872, 882-83 (W. Va. 1985).

## Loss of services and companionship

The United States contends that Sundi Greco should not be allowed to recover any damages for the services of her child lost due to the child's handicap, because Sundi Greco claims that but for the negligence of her physician she would never have carried her pregnancy to term. It follows then, that if the child had not been born, Sundi Greco would have had far less in terms of service and companionship than what she can currently expect from her handicapped child. Amicus NTLA attempts to rebut the United States' argument by analogizing Sundi Greco's situation to that of the wife in General Electric Co. v. Bush, 88 Nev. 360, 498 P.2d 366 (1972). In that case a wife was permitted to recover damages from a tortfeasor for loss of the services and companionship of her husband, who was still alive but had become a permanent invalid. The *General Electric* case exemplifies the problems relating to Sundi Greco's request for these sorts of damages in the instant case. In *General Electric*, the wife lost the services of a healthy, productive individual; here, the crux of Sundi Greco's claim is that she would have aborted the fetus had she been given the cpportunity to do so. In that case, she would have had no services or companionship at all. We thus conclude that Sundi Greco may not recover for lost services or companionship.

## Damages for emotional distress

Sundi Greco asserts that she is suffering and will continue to suffer tremendous mental and emotional pain as a result of the birth of Joshua. Several jurisdictions allow plaintiffs such as Sundi Greco to recover such damages.[9] In line with these cases, we agree that it is reasonably foreseeable that a mother who is denied her right to abort a severely deformed fetus will suffer emotional distress, not just when the child is delivered, but for the rest of the child's life.[10] Consequently, we conclude that the

---

[9]Lloyd v. North Broward Hosp. Dist., 570 So. 2d 984, 988 (Fla. Dist. Ct. App. 1990); *compare* Moores v. Lucas, 405 So. 2d 1022, 1026 (Fla. Dist. Ct. App. 1981); *see also* Viccaro v. Milunsky, 551 N.E.2d 8, 11 (Mass. 1980); Proffitt v. Bartolo, 412 N.W.2d 232, 238 (Mich. Ct. App. 1987); Ellis v. Sherman, 515 A.2d 1327, 1330 (Pa. 1986) (dicta); Naccash v. Burger, 290 S.E.2d 825, 831 (Va. 1982); Harbeson v. Parke-Davis, Inc., 656 P.2d 483, 493 (Wash. 1983) (en banc).

[10]Both parties argue by analogy to Dillon v. Legg, 441 P.2d 912 (Cal. 1968) (en banc). Nevada law recognizes the right of a parent to recover emotional distress damages if the factors set forth by the California Supreme Court in *Dillon* are met. Frances v. Plaza Pacific Equities, 109 Nev. 91, 855

mother in this case should have the opportunity to prove that she suffered and will continue to suffer emotional distress as a result of the birth of her child.

We reject the United States' argument that this court should follow an "offset" rule with regard to damages for emotional distress. *Cf.* Blake v. Cruz, 698 P.2d 315, 320 (Idaho 1984) (requiring damages for emotional distress to be offset by "the countervailing emotional benefits attributable to the birth of the child"). Any emotional benefits are simply too speculative to be considered by a jury in awarding emotional distress damages. As Dean Prosser observes:

> In the case of the wrongful birth of a severely impaired child, it would appear that the usual joys of parenthood would often be substantially overshadowed by the emotional trauma of caring for the child in such a condition, so that application of the benefit rule would appear inappropriate in this context.

*Prosser and Keeton on the Law of Torts, supra,* § 55 at 371 n.48 (citations omitted). It is beyond cavil, for example, that "[t]here is no joy in watching a child suffer and die from cystic fibrosis." Schroeder v. Perkel, 432 A.2d 834, 842 (N.J. 1981). Moreover, it would unduly complicate the jury's task to require it to weigh one intangible harm against another intangible benefit.

## CONCLUSION

We conclude that a mother may maintain a medical malpractice action under Nevada law based on her physicians' failure properly to perform or interpret prenatal examinations when that failure results in the mother losing the opportunity to abort a severely deformed fetus. Sundi Greco should be given the right to prove that she has suffered and will continue to suffer damages in the form of emotional or mental distress and that she has incurred and will continue to incur extraordinary medical and custodial care expenses associated with raising Joshua. We decline to recognize the tort sometimes called "wrongful life."

STEFFEN, C. J., and YOUNG, J., concur.

SHEARING, J., with whom ROSE, J. joins, concurring in part and dissenting in part:

---

P.2d 1024 (1993). Those factors are: the proximity of the plaintiff to the scene of the injury; whether the plaintiff actually observed the injury; and the degree of relationship between the plaintiff and victim. Although these factors are met in the case at bar, we find any reliance on *Dillon v. Legg* misplaced. Greco seeks to recover for a *direct* and personal injury, not because of mental distress occasioned by an injury to Joshua.

I agree with the majority that a mother should have a malpractice claim against professionals who negligently fail to make a timely diagnosis of fetal defects. However, I would also allow the impaired child a cause of action, with the measure of damages being the extraordinary expenses attributable to the child's impairment.

In this case, Joshua was born with congenital defects which result in his suffering paraplegia with no sensation from the hips down and permanent fine and gross motor retardation and mental retardation. It is clear that he will require extraordinary care throughout his life.

This case is not a traditional malpractice claim in which a medical professional directly causes a patient to suffer injuries. In order to find any causation from the medical professional's failure to test for abnormalities, one must accept the proposition that if Joshua's mother had been informed of the condition of the fetus, she would have had a therapeutic abortion and Joshua would never have been born.

Courts have had a great deal of difficulty in dealing with the moral implications of compensating parents or a child for that child's birth, when the plaintiffs' claim is essentially that they would all be better off had the child never been born. One reason the issue of compensation is so knotty is that it runs counter to our conception of the preciousness of human life.

This court has held that the birth of a normal healthy child is not "a 'wrong' or the type of injurious consequences for which society *should,* through its courts, as a matter of public policy, give reparation." Szekeres v. Robinson, 102 Nev. 93, 97, 715 P.2d 1076, 1078 (1986). This court then went on to state "[o]ur decision to disallow tort actions for the birth of a normal child . . . simply holds that one cannot recover in tort for such an event because the constituent element of a negligence tort, namely damages, is not present here." *Id.* at 97-98, 715 P.2d at 1079. The question in this case is whether the birth of a seriously impaired child constitutes "damages" within the contemplation of our tort law.

The majority, along with other courts, rejects the impaired child's cause of action after wrestling with the question of whether damages exist when that determination requires the comparison of the value of an impaired life to the value of no life at all. The majority quotes Becker v. Schwartz, 386 N.E.2d 807 (N.Y. 1978), in which the New York Court of Appeals stated:

> Whether it is better never to have been born at all than to have been born with even gross deficiencies is a mystery more properly to be left to the philosophers and the theologians. Surely the law can assert no competence to resolve the

issue, particularly in view of the very nearly uniform high value which the law and mankind has placed on human life, rather than its absence. Not only is there to be found no predicate at common law or in statutory enactment for judicial recognition of the birth of a defective child as an injury to the child; the implications of any such proposition are staggering. Would claims be honored, assuming the breach of an identifiable duty, for less than a perfect birth? And by what standard or by whom would perfection be defined?

There is also a second flaw. . . . The very allegations of the complaint state that had the defendant not been negligent, the infant's parents would have chosen not to conceive, or having conceived, to have terminated rather than to have carried the pregnancy to term, thereby depriving the infant plaintiff of his or her very existence. Simply put, a cause of action brought on behalf of an infant seeking recovery for wrongful life demands a calculation of damages dependant upon a comparison between the Hobson's choice of life in an impaired state and nonexistence. This comparison the law is unequipped to make.

*Id.* at 812. Other courts have echoed the distress expressed by the *Becker* court in denying this cause of action. *See* Azzolino v. Dingfelder, 337 S.E.2d 528 (N.C. 1985).

However, not all courts have taken the view that these difficulties are so great as to overcome the public policy objectives of tort law—to compensate injured parties and to deter future wrongful conduct. In Turpin v. Sortini, 643 P.2d 954 (Cal. 1982), the California Supreme Court quoted with approval a lower court opinion which stated:

"The reality of the 'wrongful life' concept is that such a plaintiff *exists* and *suffers,* due to the negligence of others. It is neither necessary nor just to retreat into meditation on the mysteries of life. We need not be concerned with the fact that had defendants not been negligent, the plaintiff might not have come into existence at all. The certainty of genetic impairment is no longer a mystery. In addition, a reverent appreciation of life compels recognition that plaintiff, however impaired she may be, has come into existence as a living person with certain rights."

. . . .

Although it is easy to understand and to endorse these decisions' desire to affirm the worth and sanctity of less-than-perfect life, we question whether these considerations alone provide a sound basis for rejecting the child's tort action. To begin with, it is hard to see how an award of

damages to a severely handicapped or suffering child would 'disavow' the value of life or in any way suggest that the child is not entitled to the full measure of legal and nonlegal rights and privileges accorded to all members of society.

*Id.* at 958, 961-62 (quoting Curlender v. Bio-Science Laboratories, 165 Cal. Rptr. 477, 488 (Ct. App. 1980)).

The California Supreme Court went on to hold that both the child and the parents had a cause of action. However, the court rejected the parents' claim for general damages and allowed only the claim for medical expenses and extraordinary expenses for specialized teaching, training and equipment required because of the impairment. *Id.* at 966.

The New Jersey Supreme Court has taken a similar approach, stating in Procanik by Procanik v. Cillo, 478 A.2d 755 (N.J. 1984):

The philosophical problem of finding that such a defective life is worth less than no life at all has perplexed not only Justice Schreiber, but such other distinguished members of this Court. . . . We need not become preoccupied, however, with these metaphysical considerations. Our decision to allow the recovery of extraordinary medical expenses is not premised on the concept that non-life is preferable to an impaired life, but it is predicated on the needs of the living. We seek only to respond to the call of the living for help in bearing the burden of their affliction.

Sound reasons exist not to recognize a claim for general damages. Our analysis begins with the unfortunate fact that the infant plaintiff never had a chance of being born as a normal, healthy child. Tragically, his only choice was a life burdened with his handicaps or no life at all. The congenital rubella syndrome that plagues him was not caused by the negligence of the defendant doctors; the only proximate result of their negligence was the child's birth.

The crux of the problem is that there is no rational way to measure non-existence or to compare non-existence with the pain and suffering of his impaired existence. Whatever theoretical appeal one might find in recognizing a claim for pain and suffering is outweighed by the essentially irrational and unpredictable nature of that claim. Although damages in a personal injury action need not be calculated with mathematical precision, they require at their base some modicum of rationality.

Underlying our conclusion is an evaluation of the capability of the judicial system, often proceeding in these cases through trial by jury, to appraise such a claim. Also at work

is an appraisal of the role of tort law in compensating injured parties, involving as that role does, not only reason, but also fairness, predictability, and even deterrence of future wrongful acts. In brief, the ultimate decision is a policy choice summoning the most sensitive and careful judgment.

. . . .

We believe that the interests of fairness and justice are better served through more predictably measured damages—the cost of the extraordinary medical expenses necessitated by the infant plaintiff's handicaps. Damages so measured are not subject to the same wild swings as a claim for pain and suffering and will carry a sufficient sting to deter future acts of medical malpractice.

*Id.* at 763.

The approach of the California and New Jersey courts is sound. These courts refuse to become mired in philosophical discussions of the meaning and value of life, and focus on compensating injured parties and deterring future wrongful conduct.

Our knowledge in the fields of genetics and obstetrics has grown dramatically, with far-reaching consequences for human life. It is clear that responsive treatments and the counseling necessitated by those treatments will develop in accordance with our ever-increasing capability to test and diagnose. It would, therefore, be anomalous for medical practitioners in these fields to be immune from liability for wrongful conduct or for departing from accepted professional standards. Unquestionably the public policy behind tort law supports compensating impaired children and their parents for the special damages resulting from impairment when the negligence of the medical professional results in the birth of the impaired child.

Although this court has stated that the public policy in Nevada is that birth of a normal healthy child is not a legally compensable damage, this court has also recognized that the value of an impaired life is not always greater than the value of non-life. *See* McKay v. Bergstedt, 106 Nev. 808, 801 P.2d 617 (1990). In addition, the legislature has recognized this fact in setting forth the policy of this state concerning the deprivation of life-sustaining procedures. NRS 449.535-.690 ("Withholding or Withdrawal of Life-Sustaining Treatment"). In these statutes, the legislature made clear that a person may choose not to sustain life. The underlying policy recognizes that, in some situations, non-life may be preferable to an impaired life; further, the policy recognizes that each individual has the right to make his or her determination as to the relative value of life and non-life.

Some courts have distinguished, as does the majority, between

the wrongful birth action of the parents and the wrongful life action of the child. There is certainly logical justification for this approach under traditional tort concepts. The wrongful life action presents problems regarding duty, causation and damages. However, I agree with the New Jersey court which stated in *Procanik by Procanik:*

> Law is more than an exercise in logic, and logical analysis, although essential to a system of ordered justice, should not become a instrument of injustice. Whatever logic inheres in permitting parents to recover for the cost of extraordinary medical care incurred by a birth-defective child, but in denying the child's own right to recover those expenses, must yield to the injustice of that result. The right to recover the often crushing burden of extraordinary expenses visited by an act of medical malpractice should not depend on the "wholly fortuitous circumstance of whether the parents are available to sue."

478 A.2d 755, 762 (N.J. 1984) (quoting Turpin v. Sortini, 643 P.2d 954, 965 (Cal. 1982)). I would allow the child the cost of the extraordinary expenses attributable to the impairment. The claims of the child and the parents are mutually dependent; it would be unfair to deny compensation to the child if the parent or parents are not available to make their claim. While there can be no duplication of recovery, either action should lie.