**Kenneth NEWBORN, et al., Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**No. CIV.A.01-0750 JR.**

United States District Court, District of Columbia.

Dec. 2, 2002.

Memorandum Supplementing Order Dec. 16, 2002

Karl J. Protil Jr., Shulman, Rogers, Gandal, Pordy & Ecker, P.A., Rockville, MD, for Plaintiffs.

Claire Whitaker, Assistant U.S. Attorney, Washington, DC, for Defendant.

### ORDER

ROBERTSON, District Judge.

It is ordered that the defendant's motion for summary judgment [# 44] is **granted**. An accompanying memorandum setting forth the reasons for the order will be issued shortly.

### MEMORANDUM

Kenneth Ray Newborn II (Kenny) died on December 21, 1997 after treatment for

sickle cell crisis in an American military hospital in Germany. His parents, who are noncommissioned U.S. Army officers, brought this wrongful death and survival action under the Federal Tort Claims Act alleging that a consulting physician at the Walter Reed Army Medical Center failed to give appropriate advice to the treating physicians in Germany. The government moved to dismiss or for summary judgment, arguing that the Newborns did not establish the requisite control and involvement of the physician at Walter Reed in Kenny's treatment to make out a "headquarters claim," and that there was no negligence on the part of the physician. The government's motion was granted by an order issued December 2, 2002. This memorandum sets forth the reasons for that order.

### Background

Kenny was diagnosed with sickle cell anemia when he was approximately three years old. His parents received permission from the Army to take him to Germany when they were posted there in 1996. Kenny received routine outpatient care in Germany at the Würzburg Army Hospital (WAH), where Dr. David Devenport was his primary care provider. Kenny experienced no serious symptoms until a two-day hospitalization at WAH for breathing problems on December 12, 1997. During this first hospitalization at WAH, Dr. Ebena took part in Kenny's treatment and reported that Kenny was "much improved," "very energetic" and "running around" when he was released from the hospital. Def.'s Att. 7; Pl.'s Ex. B at 91. On December 16, 1997 Kenny had a follow-up visit with Dr. Devenport who reported that Kenny's oxygen saturation levels and breathing had improved and that there were no signs of respiratory distress. Pl.'s Ex. G (Devenport Decl. ¶ 8). On December 18, 1997, however, Kenny was hospital-ized again at WAH for abdominal pains. Dr. Devenport treated Kenny on December 18, and then Dr. Klapprodt, the on-call physician for December 19 and 20, attended to Kenny. On December 20, according to Dr. Klapprodt, Kenny appeared to be doing well in the morning but took a turn for the worse later in the day. Dr. Klapprodt then ordered a transfusion (given the next day) and transferred Kenny to the pediatric intensive care unit at the University of Würzburg Hospital, where he died.

Kenny's parents first filed an administrative claim asserting negligence on the part of the doctors at WAH. After the Army rejected that claim, they filed this suit, asserting for the first time that their son's death was the result of negligent consultation provided to the doctors in Germany by Dr. Margaret Merino, via telephone and e-mail, from Walter Reed Army Medical Center in Washington, D.C.

It is undisputed that Dr. Merino provided consultation about Kenny's treatment, but she was one of a number of doctors who were involved.

- On December 12, 1997, Dr. Devenport sent an email to Dr. Cooper, an attending hematologist/oncologist at Walter Reed, briefly describing the condition of a recently admitted patient with sickle cell disease and focusing on the patient's abdominal pains and hypoxia despite normal oxygen saturation levels. Dr. Devenport asked Dr. Cooper for recommendations on treating the patient's "on and off pains at home." Def.'s Att. 8.

- On December 14, Dr. Merino spoke with a doctor from WAH about home pain medications for a child with sickle cell disease who was being discharged. The caller from WAH mentioned that the child had low oxygen saturations levels but said that the patient had been doing

well until recently, and that a transfer to Walter Reed was unnecessary. Pl.'s Ex. M at 28, 45.

- On December 16, Dr. Merino answered Dr. Devenport's December 12 email, responding to Dr. Devenport's questions about Kenny's hypoxia and what type of home medications would be appropriate for treating his abdominal pains. Def.'s Att. 8.

- On December 17, Dr. Devenport thanked Dr. Merino by email for her response and asked for recommendations on which military bases in the U.S. would be best for sickle cell patients. *Id.* Dr. Merino also spoke with Dr. Devenport on the telephone on December 17 or 18 about eventually sending Kenny back to the United States. Pl.'s Ex. M at 56–57.

- On December 18, Dr. Devenport transmitted a letter in support of the Newborns' reassignment, asking that Kenny be sent to the United States because his medical care was becoming increasingly difficult to handle overseas.

- On December 19, while Kenny was hospitalized, Dr. Devenport spoke to Dr. Merino by telephone about managing Kenny's pain. Dr. Merino recommended a PCA (Patient Controlled Analgesia) pump with Motrin, and a transfusion as the next option if the pain did not improve. *Id.* at 58–73; Pl.'s Ex. G (Devenport Decl. ¶ 9–10). Dr. Merino asked about the oxygen saturation levels and was told that there was no evidence of lung disease on examination and that the child was looking good. Pl.'s Ex. M at 64–67.

The Newborns' suit focused on this last call, and specifically on Dr. Merino's recommendation of pain medication rather than an immediate transfusion. The claim was that Dr. Merino's recommendation was negligent because it did not adequately take into account Kenny's oxygen saturation levels.

The government argued, first, that the Newborns' case must be dismissed because Dr. Merino lacked the "close management and control" of Kenny's case necessary to maintain a "headquarters claim" under the FTCA. Alternatively, the government argued, Dr. Merino owed no duty of care to Kenny and, even if she did, plaintiffs could not establish a prima facie case that a breach of that duty was the proximate cause of Kenny's death.

## Analysis

### I. Headquarters claim

The FTCA's waiver of sovereign immunity does not apply to claims "arising in a foreign country." 28 U.S.C. § 2680(k). Domestic acts having operative effects in other countries are nevertheless addressable under the FTCA, under a "headquarters theory," because the FTCA focuses on the place of the government employee's act or omission rather than the place of injury. *Sami v. United States,* 617 F.2d 755, 761–62 (D.C.Cir.1979); *Orlikow v. United States,* 682 F.Supp. 77, 87 (D.D.C.1988).

■ The government submits that this case should be dismissed for want of FTCA jurisdiction because Dr. Merino's role in Kenny's treatment will not support a headquarters claim. There is language in a decision of one judge of this Court to the effect that a claim brought under the headquarters theory must allege "close management and control" by an official in the United States. *See MacCaskill v. United States,* 834 F.Supp. 14, 17 (D.D.C. 1993). Most courts, however, have assigned a lower threshold to headquarters claims, recognizing them if the act of negligence is alleged to have occurred in the United States. *E.g., Sami,* 617 F.2d at 761–62; *Nurse v. United States,* 226 F.3d 996, 1003 (9th Cir.2000); *Donahue v. U.S.*

*Dep't of Justice,* 751 F.Supp. 45, 49–50 (S.D.N.Y.1990). Here, plaintiffs' allegation that Dr. Merino's acts or omissions within the United States caused Kenny's death was a sufficient basis for the assertion of subject matter jurisdiction under the FTCA.

## II. Duty of care/standard of care

■ The questions of whether Dr. Merino owed any duty of care to Kenny, and, if so, what the appropriate standard of care was, appear to have merged—or, perhaps, blurred—into a single question in the District of Columbia. *See In re Sealed Case,* 67 F.3d 965, 968 (D.C.Cir.1995), and the authorities cited therein.[1] There is some confusion in the case law, moreover, as to whether the single, merged question is one of law for the court, *id.* ("The existence of . . . a legal duty owed by the defendant to the plaintiff, is a question of law, to be determined by the court.")(citing *Zhou v. Jennifer Mall Restaurant,* 534 A.2d 1268, 1274 (D.C.1987); *Restatement (Second) of Torts* § 328B(b), (c) (1963)), or one of fact for the jury, *Washington v. Washington Hosp. Ctr.,* 579 A.2d 177, 181–82 (D.C.1990)(expert testimony required to establish standard of care; proof was sufficient to create issue for the jury). The government's first dispositive motion on the duty of care question was denied because it was not clear beyond doubt that plaintiffs could prove no set of facts that would entitle them to relief. Memorandum of Feb. 26, 2002, at 7. After discovery and fuller briefing, however, it became clear that the "precise circumstances," *In re Sealed Case,* 67 F.3d at 969, of Dr. Merino's role in Kenny Newborn's care

neither conferred nor imposed upon her the duty of deciding whether, and when, to administer the blood transfusion that plaintiffs maintain would have saved Kenny's life.

■ The existence *vel non* of a consulting doctor's duty to a patient and the nature of that duty depends upon the degree and frequency of her involvement with the patient's treatment. Substantial or frequent consultation that amounts to virtual supervision of a patient's treatment tends to give rise to a duty, whereas informal or occasional consultation does not. *Compare Sawh v. Schoen,* 215 A.D.2d 291, 627 N.Y.S.2d 7, 9 (1995)(no liability for consulting doctor who only participated in meetings to discuss plaintiff's case and offered no advice on treatment), *and Hill v. Kokosky,* 186 Mich.App. 300, 463 N.W.2d 265, 267 (1990)(no duty owed by consulting doctor who did not have any contact with patient, did not see records relating to the case, and did not know patient's name), *with Gilinsky v. Indelicato,* 894 F.Supp. 86, 90–95 (E.D.N.Y.1995)(consulting doctor who served as a mentor to calling doctor and provided continuous and substantial assistance practically serving as the ultimate decisionmaker owed duty to patient), *and Fernandez v. Admirand,* 108 Nev. 963, 843 P.2d 354, 356, 361 (1992)(consulting doctor had duty to patient because he saw and treated patient and conducted exams of patient relied upon by other doctors).[2]

Dr. Merino's involvement in Kenny's treatment falls somewhere close to the informal advice end of that spectrum. Dr. Merino did not provide the extensive and

---

**1.** District of Columbia law will be applied to the merits of plaintiffs' claim, because tort liability under the FTCA follows the law of the state where the alleged acts or omissions occurred. 28 U.S.C. § 1346(b); *Kugel v. United States,* 947 F.2d 1504, 1508 (D.C.Cir.1991).

**2.** Some of these cases focus on the existence of a physician-patient relationship, which is not one of the elements of negligence in cases against doctors according to D.C. law.

continuous type of consultation that made her practically the ultimate decisionmaker in Kenny's treatment. The doctors at WAH retained control over Kenny's treatment and did not look to Dr. Merino for supervision. Walter Reed doctors had no supervisory role vis-a-vis WAH doctors. There was no policy or protocol requiring WAH doctors to consult with Walter Reed doctors. Dr. Smith explained that WAH doctors regularly contact other doctors either at local German hospitals or U.S. military hospitals for general advice, but that there is no written or informal agreement for them to do so. Def.'s Att. 4 (Smith Decl. ¶ 8).

Dr. Merino stated that she did not "take over" Kenny's case; that Dr. Devenport exercised independent judgment in treating Kenny; and that she believed that he could handle treatment of a patient experiencing sickle cell crisis. Pl.'s Ex. P (Merino Decl. ¶ 13); Ex. M at 60–61. Dr. Devenport stated that his call to Dr. Merino on December 19 was to get a second opinion, not to be directed on how to treat Kenny. Pl.'s Ex. B at 102–03. Dr. Merino spoke to Dr. Devenport only intermittently during Kenny's hospitalization at WAH. Other WAH doctors were involved in Kenny's treatment, and they did not look to Dr. Merino for guidance. Def.'s Att. 3 (Ebena Decl. ¶ 3–5); Pl.'s Ex. J (Klapprodt Decl. ¶ 7). Dr. Klapprodt, the on-call physician from December 19 to December 20 who was in charge of Kenny's treatment immediately before his death, did not find it necessary to consult with Dr. Merino or any other doctor at Walter Reed. Pl.'s Ex. J (Klapprodt Decl. ¶ 7).

All of these facts were undisputed. Plaintiffs nonetheless seized upon Dr. Devenport's statement that he would have ordered a transfusion on December 19 if Dr. Merino had recommended it. That statement does not mean or suggest that Dr. Devenport had turned over control of his patient's treatment to Dr. Merino. The context of the statement makes it clear that Dr. Devenport was looking for a second opinion because he was "plus or minus" on whether a transfusion was necessary. Pl.'s Ex. B at 36, 39–40, 102–03; Ex. G (Devenport Decl. ¶ 12). But Dr. Devenport's uncertainty, or his willingness to accept a suggestion, did not impose on Dr. Merino the duty to decide whether and when to order a transfusion on Kenny. If it did, no specialist would undertake to advise a primary care physician who is uncertain about how to deal with a crisis, regardless of how impartial or unofficial her professional relationship was with the primary care physician was and regardless of how infrequent or insubstantial the advice. Plaintiffs have cited no cases supporting such a theory, and there appears to be none—perhaps because other judges presented with such a theory have been as disturbed as I was by its public policy implications.

### III. Proximate cause

█ Even if Dr. Merino did have a duty to decide whether and when to transfuse Kenny, plaintiffs neither adduced nor pointed to any admissible evidence that her suggestion to medicate before transfusing was the proximate cause of Kenny's death. There was no autopsy. Plaintiffs' expert Dr. Gee opined that the failure to transfuse on December 19 was more likely than not the cause of Kenny's death, but she also acknowledged that, without an autopsy, her opinion was conjecture. Pl.'s Ex. D at 4. And, like Dr. Merino, Dr. Gee offered alternative explanations for Kenny's death, such as the discontinuation of the medication prednisone on December 19 or 20, Pl.'s Ex. D at 4; Ex. K at 49–50; Ex. M at 85. Dr. Klapprodt assessed Kenny on the morning of December 20 and decided at that time not to administer a

transfusion immediately, because Kenny looked well. Pl.'s Ex. J (Klapprodt Decl. ¶ 6). That undisputed fact also undercuts plaintiffs' assertion that Dr. Merino's conduct was the proximate cause of Kenny's death, especially considering Dr. Gee's opinion that Kenny "may have gotten better if [the transfusion] was given earlier in the day." Pl.'s Ex. K at 51.