Carlei Nacole **GRUBBS** By and Through Her Next Friend, Kimberly Suzane **GRUBBS**, et al., Movants/Cross Respondents,

v.

**BARBOURVILLE FAMILY HEALTH CENTER, P.S.C., et al., Respondents/Cross Movants,**

and

**Nathan Robert Bogan By and Through His Next Friends, Gretchen Bogan and Daniel Bogan, et al., Movants/Cross Respondents,**

v.

**Altman & McGuire, P.S.C., et al., Respondents/Cross Movants.**

No. 2001–SC–0563–DG, 2001–SC–0961–DG, 2001–SC–0571–DG, 2001–SC–0959–DG.

Supreme Court of Kentucky.

Aug. 21, 2003.

As Amended Aug. 27, 2003.

Rehearing Denied Dec. 18, 2003.

Barbara Elliott Yeager, P.S.C., Barbourville, Counsel for Movants/Cross Respondents, Carlie Nacole Grubbs, by and Through Her Next Friend, Kimberly Suzane Grubbs; Suzane Grubbs; and Kenneth Charles Grubbs.

Mark E. Nichols, Melanie S. Marrs, Lynn, Fulkerson, Nichols & Kinkel, PLLC, Lexington, Counsel for Respondents/Cross Movants, Barbourville Family Health Center, P.S.C.; and B.R. Jung, M.D.

Wayne F. Collier, Kinkead & Stilz, P.S.C., Lexington, Counsel for Movants/Cross Respondents, Nathan Robert Bogan by and Through His Next Friends, Gretchen Bogan and Daniel Bogan; Nathan Robert Bogan; Gretchen Bogan, and Daniel Bogan.

Margaret M. Pisacano, Lynn Rikhoff Kolokowsky, Jenkins Pisacano Robinson & Bailey, Lexington, Counsel for Respondents/Cross Movants, Altman, Mcguire & Pigg, P.S.C.; Altman, Mcguire & Mcclellan, P.S.C.; Altman, Mcguire, Pigg & Mcclellan, P.S.C.; Harry E. Altman; James R. Pigg; Rick A. Mcclellan, and Tom O. Mcguire.

George Edward Overbey, Jr., Monica Mary McFarlin, Kentucky Cabinet for Health Services, Department for Medicaid Services, Frankfort, Counsel for Kentucky Cabinet Health Services, Dept. for Medicaid Services.

Geoffrey R. Surtees, Francis J. Manion, Center for Law & Justice, New Hope, Robert C. Cetrulo, President, Northern Kentucky Right to Life, Covington, Counsel for Amici Curiae, Catholics United for Life, Northern Kentucky Right to Life, Kentucky Coalition for Life, and American Center for Law Justice–Midwest.

Opinion of the Court by Chief Justice LAMBERT.

This Court granted discretionary review to consider two issues of first impression in this Commonwealth. The first is whether the parents of a child born with incurable and profound birth defects have a cause of action against a physician for failing to correctly diagnose and/or inform them of the fetal medical condition in time for an abortion. The second issue is whether the child has a claim for the same medical errors or omissions.[1] To decide these issues, we must focus on three areas of inquiry: (1) whether these are new causes of action requiring legislative authorization, or whether they are conventional negligence cases; (2) if we determine that they are traditional negligence actions, whether, as a matter of law, the elements of negligence can be proven; and (3) whether there are public policy considerations that affect the analysis. Both cases were decided upon summary judgment, and thus we are called upon to review the case to determine if it should proceed to trial.[2]

**THE GRUBBS CASE**

In both cases, the plaintiffs allege that early diagnostic procedures revealed the birth defects, but that the physicians failed

---

1. Although these causes of action are often referred to as "wrongful birth" and "wrongful life," respectively, these terms can be misleading. *See Schork v. Huber*, Ky., 648 S.W.2d 861, 863 (1983)(Leibson, J. dissenting)("The issue is not as dramatic as depicted ... We are simply called upon to decide whether a child born as a result of a doctor's negligence is a compensable element of damages").

2. *Steelvest v. Scansteel Service Center, Inc.,* Ky., 807 S.W.2d 476 (1991).

to accurately interpret and/or report the results. In late 1995, Kimberly Grubbs sought prenatal care from Dr. B.R. Jung at the Barbourville Family Health Center. On April 19, 1996, when Ms. Grubbs was approximately 24 weeks pregnant, Dr. Jung performed a prenatal screening ultrasound. Ms. Grubbs and her husband were informed that the results showed that the pregnancy was progressing normally. Approximately two months later, a second ultrasound was performed. Thereafter, Dr. Jung first informed the parents that the fetus might have birth defects. Dr. Jung referred Ms. Grubbs to the University of Kentucky Medical Center for further evaluation. On June 24, 1996, in the eighth month of pregnancy, a level II ultrasound was performed by Maternal/Fetal Medicine Specialist Dr. Douglas Milligan, and he determined that the fetus had spina bifida and hydrocephalus. On July 22, 1996, Carlei Nacole Grubbs was born with the diagnosed birth defects. She is also paralyzed from the waist down, has poor vision and misshapen kidneys.

The Grubbs's brought a negligence action against Dr. Jung and the Barbourville Family Health Center. The Grubbs's alleged that the defendants negligently failed to interpret the April 19, 1996 ultrasound correctly, that they failed to inform the Grubbs's that the ultrasound revealed the presence of profound birth defects, and that they failed to inform the Grubbs's of other prenatal diagnostic tests for spina bifida and hydrocephalus. The Grubbs's alleged that if they had been informed of the correct diagnosis at the time of the April ultrasound, they would have terminated the pregnancy; and therefore, the defendants' failure to timely notify them of the defects prevented them from making an informed decision to continue or terminate the pregnancy.

The defendants moved for summary judgment, claiming that Kentucky does not recognize causes of action for wrongful birth and wrongful life. The trial court ruled that it would follow the perceived majority rule and allow the wrongful birth action to proceed. The claim was not a new cause of action, the trial court stated, but a traditional medical negligence claim requiring the elements of duty, breach, causation and injury to be proven for the plaintiffs to prevail.

However, the trial court refused to recognize the wrongful life claim, stating that as a matter of law there was no injury, and thus the elements of negligence could not be proven. The trial court's reasoning was that the alleged injury was the child's life itself, and that it was against public policy to weigh a human life, albeit imperfect, against no life at all.

The defendants subsequently filed a second motion for summary judgment based upon the statute of limitations. The trial court granted this motion, stating that the proper time to file suit was within one year from discovery of the condition rather than one year from the child's birth. A final judgment of dismissal was entered.

## THE BOGAN CASE

The facts of the Bogan case are similar. In late 1992, Gretchen Bogan learned that she was pregnant and sought prenatal care from the obstetricians of Altman, McGuire & Pigg, P.S.C., in Pike County. In December 1992, when the fetal gestational age was estimated to be twenty-two weeks, a pre-natal screening ultrasound was performed by an ultrasound technician. According to Dr. Altman's deposition, the ultrasound was administered to "confirm the dates and rule out obvious anomalies." Dr. Altman interpreted the ultrasound as normal and so advised Ms. Bogan. On March 31, 1993, Nathan Robert Bogan was born several weeks prematurely by caesarean section. The caesarian was necessary because a cyst had enlarged Nathan's

head. As the cyst occupied most of his cranium, he has no eyes and no brain, although he has an underdeveloped brain stem that supports minimal autonomic functioning. He has a cleft palate and cannot speak. He must be strapped into a wheelchair to sit, and he has no control of his bowels. The Bogans point out in their brief that Nathan "cannot do anything but exist."

In their complaint, the Bogans maintained that the defect was visible in the ultrasound films. They sued the defendants, alleging numerous theories of recovery including medical malpractice, wrongful birth, and wrongful life. The gravamen of the complaint was that the failure to interpret the ultrasound correctly and to perform an amniocentesis test prevented the Bogans from making an informed decision about continuation or termination of the pregnancy. The Kentucky Cabinet for Health Services, Department for Medicaid Services, intervened to recover sums it had paid on behalf of Nathan Bogan. The obstetricians sought summary judgment, and the trial court held that the Bogans could not recover for wrongful life or wrongful birth. However, the trial court allowed the Bogans' claim for damages for pain and suffering and permanent scarring suffered in connection with the caesarean delivery to proceed. That claim remains pending in the Pike Circuit Court. Otherwise, the summary judgment was made final and this appeal proceeded.

In summary, both trial courts denied the child's claim. As to the parents' claims, the trial court in the *Bogan* case held that limited damages could be awarded to the mother due to the caesarian. The trial court in the *Grubbs* case authorized the parents' claim to the full extent of damages (although the case was ultimately dismissed upon statute of limitation grounds).

## THE COURT OF APPEALS

The Court of Appeals consolidated the two cases to consider whether Kentucky law recognizes so-called 'birth-related torts,' i.e., wrongful conception or pregnancy, wrongful birth, and wrongful life. As a starting point, the Court of Appeals considered this Court's decision in *Schork v. Huber*,[3] a medical malpractice case involving a couple who had a healthy child despite having undergone a surgical sterilization procedure. In *Schork*, this Court refused to recognize the wrongful conception claim, stating that "parents cannot recover damages based upon the costs of raising a healthy but unexpected child from a doctor following an unsuccessful sterilization procedure."[4] Critical to the Court's holding was that damages were highly speculative, as any recovery would be offset by the benefit to the parents of having a normal, healthy child. The Court concluded that causes of action for not only wrongful conception but all birth-related torts were matters within the exclusive purview of the legislature.[5]

The Court of Appeals declined to follow the *Schork* majority, considering the conclusion about wrongful birth and wrongful life non-binding dictum. Instead, the Court of Appeals held that these claims should be examined under traditional negligence principles as advocated in the two *Schork* dissenting opinions. The Court of Appeals then considered whether the elements of negligence—duty, breach, causation, and injury—were present in the claims.

As to the parents' claims, the Court of Appeals stated that the elements could be satisfied and held that plaintiffs who allege

3. Ky., 648 S.W.2d 861 (1983).

4. *Id.* at 862.

5. *Id.* at 863.

that a physician is negligent by depriving them of information necessary to make informed decisions about a pregnancy have a viable cause of action for medical negligence. As to the claims made by the children with disabilities, the Court of Appeals concluded that the first element of negligence could not be established, as there is no separate, independent duty owed by a physician to an unborn child apart from the duty owed to the mother. Thus, the children's claims were held not actionable as a matter of law. Accordingly, the Court of Appeals remanded the *Bogan* case for further proceedings, yet affirmed the dismissal of the *Grubbs* case upon statute of limitations grounds.[6]

## ANALYSIS

We agree with the Court of Appeals that the specific issues presented here were not before the Court in *Schork*, and thus that its conclusions denying wrongful birth and wrongful life claims are not controlling. Rather, we must decide whether the claims now before this Court upon the facts presented can be decided upon existing tort principles or whether deference to legislative initiative would be more appropriate. From the pleadings, the claims sound in traditional medical negligence. Thus, the claims should be analyzed under traditional negligence principles.

We shall first consider the parents' claims against the defendants according to the primary elements of negligence:

duty, breach, and consequent injury.[7] As to the first element, in Kentucky a physician has the duty to use the degree of care and skill expected of a competent practitioner of the same class and under similar circumstances.[8] Moreover, there is a duty of fidelity imposed upon the physician that arises from the special relationship between a physician and patient, which has been described as follows:

> The relationship of a patient to his physician is by its nature one of the most intimate. Its foundation is the theory that the physician is learned, skilled, and experienced in the afflictions of the body about which the patient ordinarily knows little or nothing but which are of the most vital importance to him. Therefore, the patient must necessarily place great reliance, faith and confidence in the professional word, advice and acts of his doctor. It is the physicians' duty to act with the utmost good faith and to speak fairly and truthfully at the peril of being held liable for damages for fraud and deceit.[9]

This duty mandates that a physician "fully disclose his findings on examination and the opinions he holds." [10] Accordingly, a physician is obligated to inform a patient of the diagnosis and the known risks or dangers inherent therein so that the patient can make an intelligent decision regarding the course of treatment.[11] If the patient's ailment is

---

6. As this case is being resolved on the merits, it will not be necessary to further review the Court of Appeals statute of limitations analysis.

7. *Mullins v. Commonwealth Life Ins. Co.*, Ky., 839 S.W.2d 245 (1992); *M & T Chemicals, Inc. v. Westrick*, Ky., 525 S.W.2d 740 (1974); *Howard v. Fowler*, 306 Ky. 567, 207 S.W.2d 559 (1947); *City of Louisville v. Bailey's Guardian*, 262 Ky. 486, 90 S.W.2d 712 (1936).

8. *Mitchell v. Hadl*, Ky., 816 S.W.2d 183, 185 (1991)(*citing Blair v. Eblen*, Ky., 461 S.W.2d 370, 373 (1970)).

9. *Mitchell v. Hadl* at 185 (*quoting Adams v. Ison*, Ky., 249 S.W.2d 791, 793 (1952)); *see also*, 61 Am.Jur.2d, *Physicians, Surgeons, and Other Healers* § 142, at 256–57 (2002).

10. *Mitchell* at 185.

11. 61 Am.Jur.2d, *Physicians, Surgeons, and Other Healers* §§ 211–212, 318–19 (2002).

beyond the physician's knowledge, ability or capacity to treat with reasonable success, the physician has a duty to disclose the situation to the patient and to advise the patient to consult a specialist.[12] If a physician discovers that an ailment is incurable and fails so to advise the patient, the practitioner is guilty of negligence.[13]

In applying the law to the instant cases, viewing all allegations in the light most favorable to the plaintiffs as required for review of summary judgment dispositions, the elements of duty and breach feasibly could be satisfied by adequate proof. Pregnancy is a medical condition for which treatment by physicians had been sought to ensure the health of the mother and fetus, implicating the physician's duty of care that mandates full disclosure. A misdiagnosis or withholding of medical information regarding the pregnancy, therefore, could be considered a breach of the duty of care. To establish this deviation from the standard of care, the plaintiffs would need to prove that a reasonably competent obstetrician would have observed the defects from the ultrasounds and would have reported the results to the patients. This scenario is analogous to a physician's failure to diagnose and inform a patient of a cancer or broken bone, etc.

Establishing the other element of negligence, consequent injury, appears more complex. In Kentucky, if the physician's service falls below the expected level of care and skill and this negligence proximately caused injury or death, then all elements of a malpractice action have been met.[14] The parents here contend that by being negligently deprived of pertinent medical information, they were prevented from making an informed decision regarding continuation of the pregnancy. The Bogans specifically maintain that had they known at the time of the ultrasound that their child would be born without a brain, they would have sought an abortion while doing so was still a legally and medically available option. The Grubbses maintain that they would have done likewise had they been informed of the hydrocephalus and spina bifida. Thus, the plaintiffs contend, injury was in their taking an unwanted pregnancy to term, which was caused by the allegedly negligent misdiagnoses provided by the defendants. These arguments are consistent with various views appearing to be a majority which recognizes causes of action for wrongful birth.[15]

We have been directed to *Azzolino v. Dingfelder*,[16] a case from the Supreme Court of North Carolina in which the court refused to allow a parent's claim for wrongful birth under a traditional tort analysis. In its consideration of the elements of negligence, the court first assumed *arguendo* that the physician defendants owed the plaintiffs a duty and that the duty had been breached. Although

12. *Id.* at §§ 213–214.

13. *Id.*

14. *Reams v. Stutler*, Ky., 642 S.W.2d 586 (1982); *Wheeler v. Baptist Healthcare System, Inc.*, 14 Fed.Appx. 559 (6th Cir.2001).

15. *See, e.g., Lininger v. Eisenbaum*, 764 P.2d 1202 (Colo.1988)(viable malpractice claim by parents whose second child was born blind, that physicians were negligent in failing to diagnose first child's blindness as hereditary and that parents would not have had second child but for such negligence); *Phillips v. United States*, 508 F.Supp. 544 (D.S.C.1981) (actionable wrongful birth claim under South Carolina law by parents of child with Down's syndrome); *Schroeder v. Perkel*, 87 N.J. 53, 432 A.2d 834 (1981)(actionable claim by parents whose second child was born with cystic fibrosis against physicians for failing to diagnose first child's cystic fibrosis earlier thereby denying parents informed decision about second pregnancy).

16. 315 N.C. 103, 337 S.E.2d 528 (1985).

the court considered the causation element more problematic because the defendants did not cause the child's genetic defect, the court nevertheless assumed that the birth of the child was the proximate result of the physician's negligence.[17] The court then stated that a 'traditional' negligence analysis could not proceed beyond this point because it would have to reach the 'untraditional' conclusion "that the existence of a human life can constitute an injury cognizable at law." [18] With regard to the child's claim, the court was also unwilling to equate the occurrence of a human life with injury under a traditional tort analysis and consequently refused to recognize that cause of action.

The Supreme Court of Georgia likewise refused to recognize wrongful birth actions under a traditional tort analysis in *Atlanta Obstetrics and Gynecology Group v. Abelson*.[19] As in *Azzolino*, the court believed the duty and breach elements could be satisfied, stating that a physician has a generalized duty to impart relevant information to a patient concerning his or her medical condition,[20] and that a woman has a constitutional right to make an informed decision regarding her procreative options.[21] The Georgia court held, however, that the traditional tort analysis broke down on the elements of injury and causation. As to the injury, the Georgia court agreed with the *Azzolino* majority in its unwillingness to say that an impaired human life amounted to a legal injury. The Georgia court concluded that the matter was more suited to the legislature.[22]

■ We agree with this analysis of the injury element. Although the parents in the instant cases allege that their injury was in being deprived of accurate medical information that would have led them to seek an abortion, we are unwilling to equate the loss of an abortion opportunity resulting in a genetically or congenitally impaired human life, even severely impaired, with a cognizable legal injury. This issue was addressed by Judge Wachtler of the Court of Appeals of New York in his dissenting opinion from the majority view that claims for wrongful birth should be recognized. He explained that to hold the prenatal care physician liable for the product of such a defect is a distortion of fundamental legal principles.

> The heart of the problem in these cases is that the physician cannot be said to have caused the defect. The disorder is genetic and not the result of any injury negligently inflicted by the doctor. In addition it is incurable and was incurable from the moment of conception. Thus the doctor's alleged negligent failure to detect it during prenatal examination cannot be considered a cause of the condition by analogy to those cases in which the doctor has failed to make a timely diagnosis of a curable disease. The child's handicap is an inexorable result of conception and birth.
>
> . . . .
>
> It is a tort without precedent, and at variance with existing precedents both old and new. Indeed the members of the majority are divided among themselves as to what principle of law re-

17. *Id.* at 533.

18. *Id.* at 534.

19. 260 Ga. 711, 398 S.E.2d 557 (Ga.1990).

20. *Id.* at 560 (citing, *inter alia*, 61 Am.Jur.2d 358, *Physicians, Surgeons, and Other Healers* § 229 (1981)).

21. *Id.* at 561 (citing *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Smith v. Cote*, 128 N.H. 231, 513 A.2d 341, 346 (1986)).

22. *Id.* at 563.

quires the doctor to pay damages in this case. The limits of this new liability cannot be predicated. But if it is to be limited at all it would appear that it can only be confined by drawing arbitrary and artificial boundaries which a majority of the court consider popular or desirable. This alone should be sufficient to indicate that these cases pose a problem which can only be properly resolved by a legislative body, and not by courts of law.[23]

The foregoing analysis is equally applicable to the wrongful life claims and they, too, must fail for lack of a cognizable injury.

Returning to *Azzolino*, the court pointed out the uncertainty and lack of uniformity in jurisdictions recognizing wrongful birth regarding the proper measure of damages and the duty to mitigate damages arises from a failure to recognize that the "injury" they seek to compensate is not an injury under a strictly traditional application of tort theory. Although under traditional tort law defendants are liable for all the reasonably foreseeable results of their negligence, successful plaintiffs in wrongful birth actions have received various types of damages ranging from the expenses resulting from the impairment but not the normal costs of raising the child, to the entire cost of raising the child with no reduction for the cost of raising a healthy child, to only the parents' own suffering and mental anguish resulting from the child's birth but not the expense of raising the child. There has also been no consensus as to whether the damages should be reduced or offset by any emotional or other benefit to the parents through the child's life, or whether there is a duty on the parents to mitigate damages by placing the child for adoption.[24] The divergence of views on damages reveals the flaws in the conclusion that a life may be considered a legally cognizable injury.

If we held otherwise, there would be questions regarding which incurable birth defects, left negligently undiagnosed from prenatal diagnostic procedures, should warrant recovery:

> When will parents be allowed to decide that their child is so "defective" that given a chance they would have aborted it while still a fetus and, as a result, then be allowed to hold their physician civilly liable? [Is it] [w]hen the fetus is only the carrier of a deleterious gene and not itself impaired ... [or] [w]hen the fetus is of one sex rather than the other?[25]

In *Taylor v. Kurapati*,[26] the court held that the use of the benefits rule in determining offset of damages in wrongful birth cases could slide quickly into applied eugenics.[27] After a brief history of the American eugenics movement of the early twentieth century, which espoused reproduction of the "fit" and discouraged the birth of the "unfit," the court noted:

> To our ears, at the close of the twentieth century, this talk of the "unfit" and of "defectives" has a decidedly jarring ring; we are, after all, above such lethal nonsense. But are we? We know now that we all have at least five recessive genes but ... when scientists map the human genome, they will unveil many more potentially harmful genes in each of us ... [p]sychoses, hypertension, diabetes, early- and late-appearing cancers, degenerative disorders, susceptibility genes for

**23.** *Becker v. Schwartz,* 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807, 816, 819 (1978).

**24.** *Azzolino* at 534–535.

**25.** *Id.* at 535.

**26.** 236 Mich.App. 315, 600 N.W.2d 670 (1999).

**27.** *Id.* at 688.

communicable diseases, genes for various mental deficiencies, aging genes, and other variations and disorders will be ascertained. Will we then see the tort of wrongful birth extended to physicians who neglect or misinterpret genetic evidence and thereby fail to extend the option of a eugenic abortion to the unsuspecting parents of a genetically "unfit" or "defective" child? [28]

These questions reinforce our view that courts should exercise great restraint in recognizing such new and complex causes of action.

█ The Bogans present an interesting issue unrelated to the tort aspects of the claims, yet which merits attention. The Bogans believe that patients should have a breach of contract action against the physicians who offered and charged for diagnostic prenatal testing, yet who allegedly did not perform those services correctly. Despite our holding denying the tort claim as a matter of law, a physician who contracts and charges for a service, such as a prenatal ultrasound and consequent opinion as to the results of the ultrasound, is liable for any breach of contract in this regard. We do not believe physicians should be relieved of any proven contractual responsibility to report to patients the accurate results of diagnostic procedures, even if the condition is "incurable." In the absence of such a conclusion, we would be forced to hold that physicians could perform and charge for diagnostic procedures and report whatever they want if the diagnosis is of an incurable condition, and physicians could legally charge and be paid for services they did not perform.

In the Grubbs case, the final judgment of the Knox Circuit court dismissing all claims is reinstated. In the Bogan case, the final judgment dismissing the wrongful birth and wrongful life claims is reinstated, but the case is remanded to the Pike Circuit Court for adjudication of the claims for pain and suffering and permanent scarring suffered in connection with the caesarean section delivery.

COOPER, GRAVES, and JOHNSTONE, JJ., concur.

WINTERSHEIMER, J., concurs by separate opinion.

KELLER, J., files a separate opinion concurring in part and dissenting in part in which STUMBO, J., joins.

Concurring opinion by Justice WINTERSHEIMER.

I concur with the majority opinion, but wish to state additional reasons for my concurrence. Obviously, the claims in this action involve a macabre twist of logic which sets them apart from the ordinary medical negligence action. Simply stated, the life of a child cannot constitute an injury and thus there can be no recognition of either a wrongful life or a wrongful birth claim.

As stated almost twenty years ago in *Schork v. Huber*, Ky., 648 S.W.2d 861 (1983):

> Wrongful life is a contradiction in terms. It is contrary to the public policy of this state as expressed by the legislature and interpreted by the courts.

*Schork, supra*, sends a clear and unmistakable message. The interpretation of *Schork* by the Court of Appeals is erroneous and unacceptable. A claim for wrongful life is contrary to the intrinsic value and sanctity of human life. It would place the courts in the position of affirming that death, or nonexistence, is preferable to life.

Because of the "nearly universal" reluctance, *Williams v. Univ. of Chicago Hosp.*,

---

28. *Id.* at 690.

179 Ill.2d 80, 227 Ill.Dec. 793, 688 N.E.2d 130, 133 (1997), to adopt a premise that devalues human life so completely, the overwhelming majority of courts, which have considered the issue, have rejected claims for wrongful life. *See e.g. Elliott v. Brown,* 361 So.2d 546 (Ala.1978); *Goldberg v. Ruskin,* 113 Ill.2d 482, 101 Ill.Dec. 818, 499 N.E.2d 406 (1986); *Bruggeman v. Schimke,* 239 Kan. 245, 718 P.2d 635 (1986); *Taylor v. Kurapati,* 236 Mich.App. 315, 600 N.W.2d 670 (1999); *Azzolino v. Dingfelder,* 315 N.C. 103, 337 S.E.2d 528 (1985); *Hester v. Dwivedi,* 89 Ohio St.3d 575, 733 N.E.2d 1161 (2000).

The reason for rejecting a wrongful life claim does not simply involve the difficulty in applying traditional tort concepts such as duty, breach, injury, proximate cause and damages. Instead, the paramount reason for rejecting a wrongful life claim involves the very dignity of the human person and the very sanctity of human life itself. It is basic to our culture that human life is precious. To recognize wrongful life as a tort would do violence to that purpose and is completely contradictory to the belief that life is precious.

Medically, the separate existence of the unborn child has been recognized by the highly respected and widely used medical textbook, *Williams Obstetrics* (16th Edition, Appleton–Century–Crofts 1980). The text observes that "we have entered an era in which the fetus can be rightfully considered as a second patient … fetal diagnosis and therapy have now emerged as legitimate tools the obstetrician must possess."

The argument that there is a kind of "quality of life" ethic is without any merit. This Court has rejected the quality of life philosophy in *DeGrella By and Through Parrent v. Elston,* Ky., 858 S.W.2d 698 (1993), which recognized that an individual has an inalienable right to life as declared by the United States Declaration of Independence and protected by Section One of the Kentucky Constitution. Any quality of life ethic favors the life of the healthy over the infirm, the able-bodied over the disabled and the intelligent over the mentally challenged. If logically extended, it could produce a culture that condones the extermination of the weak by the strong or the more powerful.

The Nazi regime under Adolph Hitler is a not too distant reminder of this kind of eugenic approach. Unfortunately, such thoughts are not limited to foreign nations but can also be found in the writings of Justice Oliver Wendell Holmes in *Buck v. Bell,* 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927), which approved of sterilization of the mentally incompetent. *Taylor, supra,* calls to our attention the influence that Hitler's experiments with sterilization had on the American eugenics movement. Eugenics espouses the reproduction of the fit over the unfit and discourages the birth of the unfit. Bowman, *The Road to Eugenics,* 3 U. Chic. L. Sch. Roundtable 491 (1996).

It is significant to observe that even in three of the jurisdictions which have recognized a claim for wrongful life, all have refused to permit an award of general damages. *See Turpin v. Sortini,* 31 Cal.3d 220, 182 Cal.Rptr. 337, 643 P.2d 954 (1982); *Procanik v. Cillo,* 97 N.J. 339, 478 A.2d 755 (1984); *Harbeson v. Parke–Davis, Inc.,* 98 Wash.2d 460, 656 P.2d 483 (1983). The reason for this is the same reason that a majority of jurisdictions have rejected wrongful life claims completely, namely, that measuring the value of an impaired life as compared to nonexistence is a task that is beyond mere mortals, whether judges or jurors. *Harbeson, supra.*

A claim for wrongful life must be rejected because it would definitely discriminate against disabled persons and could lead to a eugenic culture where the "unfit" are

made disposable. In effect, doctors and other healthcare professionals would be punished for not identifying and eliminating any disabled children in the womb. *See* Bernadette Kennedy, Comment, *The Trend toward Judicial Recognition of Wrongful Life: A Dissenting View,* 31 U.C.L.A. L.Rev. 473 (1983). Such an approach is inherently dangerous. What "defect" will the law recognize as compensable? Who will draw the line as to what is severe and what is not severe? Will physical as well as mental impairments be involved?

It is obvious that many of the so-called disabled can and do have lives of immense value to themselves and to others. Such a concept is clearly envisioned in the adoption of the "Americans with Disabilities Act" by the United States Congress several years ago.

It is also clear that any claim for wrongful birth should not be recognized because it requires that life itself constitute some kind of legal injury. The court in *Taylor* clearly expressed a view that I would adopt regarding wrongful birth cases:

> The very phrase "wrongful birth" suggests that the birth of a disabled child was wrong and should have been prevented. If one accepts the premise that the birth of one "defective" child should have been prevented, then it is but a short step to accepting the premise that the births of classes of "defective" children should similarly be prevented, not just for the benefit of the parents but also for the benefit of society as a whole through the protection of the "public welfare." This is the operating principle of eugenics.

*Taylor* rejected a wrongful birth claim based on its close relationship with wrongful life. That court recognized that the two claims have some differences but more similarities. An extremely significant element underlying both wrongful life and wrongful birth claims is a subjective determination about disability, retardation and other impairments of the unborn child. If there is to be consistency in the law, both wrongful life and wrongful birth actions must be rejected. To permit a claim for wrongful life or wrongful birth would undermine the proposition that all human persons, no matter their race, religion, or ability, are precious and worthy of respect.

GRAVES, J., joins this concurring opinion.

KELLER, Justice, Concurring in Part and Dissenting in Part.

[T]he termination of pregnancy involves controversial and divisive social issues. Nonetheless, the Supreme Court of the United States has held that a woman has a constitutionally secured right to terminate a pregnancy. It follows from *Roe* that the plaintiff [mother] may seek, and the defendants may provide, information and advice that may affect the exercise of that right. The basic social and constitutional issue underlying this case has been resolved; we need not cover ground already traveled by a court whose interpretation of the National Constitution binds us. Today we decide only whether, given the existence of the right of choice recognized in *Roe,* our common law should allow the development of a duty to exercise care in providing information that bears on that choice.[1]

In Kentucky, a medical malpractice action is merely a "branch of [the] well traveled road [of common law negligence],"[2] and a medical malpractice plaintiff must demonstrate the same prima facie case—

---

**1.** *Smith v. Cote,* 128 N.H. 231, 513 A.2d 341 (1986) (citation omitted).

**2.** *Farmers Bank & Trust Co. v. Rice,* Ky., 674 S.W.2d 510, 511 (1984).

consisting of duty, breach, causation, and injury—required in any negligence case. Thus, a medical malpractice plaintiff must "prove that the treatment given was below the degree of care and skill expected of a reasonably competent practitioner and that the negligence proximately caused injury[.]"[3] The Court of Appeals below concluded that, of the various tort claims presented in these combined appeals, the only timely-filed tort claim for which a prima facie case was supported by the evidence— and thus the only tort claim appropriate for jury resolution—was Gretchen and Daniel Bogan's ("the Bogan parents"') allegation that their physicians negligently interfered with their reproductive rights when they deprived them of information necessary to make an informed decision whether to carry the fetus to term by incorrectly interpreting an ultrasound examination and failing to perform additional prenatal testing. A majority of this Court concedes that "the claims should be analyzed under traditional negligence principles"[4] and concludes that a jury could reasonably determine that the Bogans' physicians breached a duty of care by "misdiagnosi[ng] or withholding ... medical information regarding the pregnancy[.]"[5] A majority of this Court concludes, however, that none of the plaintiffs in these combined appeals can demon-

strate a cognizable legal injury and therefore holds that the trial courts should have granted summary judgment for the defendants as to all of the tort claims against them. Although I agree with the majority's conclusion that the claims brought on behalf of Carlei Grubbs and Nathan Bogan do not demonstrate an injury for which a recovery is available in tort, I would hold that a viable jury issue exists as to the Bogan parents' claim in their complaint that the defendants' negligence "deprived [them] of the opportunity to make informed decisions as to whether to seek treatment or terminate the pregnancy." Accordingly, I agree with the Court of Appeals's holding in its entirety, and I thus dissent from the majority opinion to the extent that I would reverse the trial court's partial summary judgment against the Bogan parents and remand the Bogan parents' negligence action for trial in the Pike Circuit Court. In my opinion, if a jury finds one or more of the defendants liable to the Bogan parents, the trial court should permit the Bogan parents to recover for any of the elements of damages listed in the complaint that are supported by the evidence at trial.

In my view, the majority and concurring opinions suffer from a common analytical flaw. Perhaps misled by the confusing "wrongful birth" label[6] that is often at-

3. *Reams v. Stutler*, Ky., 642 S.W.2d 586, 588 (1982). *See also Mitchell v. Hadl*, Ky., 816 S.W.2d 183, 185 (1991).

4. *Grubbs v. Barbourville Family Health Center, P.S.C.*, Ky., 120 S.W.3d 682 at 687 (2001).

5. *Id.* at 688. Later, however, the majority opinion expresses reservations about the scope of potential liability. *Id.* at 690 ("If we held otherwise, there would be questions regarding which incurable birth defects, left negligently undiagnosed from prenatal diagnostic procedures, should warrant recovery."). In response, I would observe that such concerns should be allayed by defining

the physician's duty in terms of the reasonably prudent patient's expectations. *See Canesi v. Wilson*, 158 N.J. 490, 730 A.2d 805, 816 (1999).

6. *See Viccaro v. Milunsky*, 406 Mass. 777, 551 N.E.2d 8, 9 (1990):

These labels [wrongful life/birth/conception/pregnancy] are not instructive. Any "wrongfulness" lies not in the life, the birth, the conception, or the pregnancy, but in the negligence of the physician. The harm, if any, is not the birth itself, but the effect of the defendant's negligence on the parents' physical, emotional, and financial well-being resulting from the denial of the

tached to such claims, the justices who today deny the Bogan parents' claim do so under a skewed analysis that improperly conflates the claimants' injury allegation with their ultimate claims for damages. The majority and concurring opinions mischaracterize the Bogan parents' legal injury as Nathan Bogan's very existence [7] when, in fact, the plaintiffs allege that they suffered legal injury from the physicians' "negligent invasion of the parental right to decide whether to avoid the birth of a child with congenital defects." [8] Stated otherwise, while both the majority and concurring opinions attempt to frame the relevant issue before us as whether Nathan Bogan's *life* can constitute a legal injury in the context of a prima facie case for medical malpractice, "we need not find that 'life, even life with severe defects,' constitutes a legal injury in order to recognize the ... claim for relief" [9] because "[t]he resulting injury to the plaintiff parents lies in their being deprived of the opportunity to make an informed decision to terminate the pregnancy[.]" [10] The Supreme Court of New Jersey recently discussed the theoretical basis for a medical malpractice claim in this context and explained that, although one facet of a plaintiff's compensable *damages* in such cases may consist of extraordinary costs associated with the care and education of a child with birth-defect-related disabilities, those damages are available only because they are the result of a physician's violation of the patient's right to make an informed procreative decision:

A wrongful birth cause of action is predicated on a woman's right to determine for herself whether or not to continue or terminate her pregnancy. Persons "have a right of their own either to accept or reject a parental relationship, and the deprivation of that right by the negligent misconduct of another creates a cause of action in the parents." The right protects a distinctly personal interest.

The violation of the interest in self-determination that undergirds a wrongful birth cause of action consists of the parents' lost opportunity to make the personal decision of whether or not to give birth to a child who might have birth defects. The claim in a wrongful birth action can arise when a physician fails to provide adequate genetic counseling, fails to detect a discoverable fetal defect or to inform the parents thereof, fails to interpret test results properly, or fails to warn of a child being born with a defect.

Because the patient's protectable interest is the personal right of self-determination, the doctor's duty of disclosure

---

parents of their right ... to decide whether to bear a child or whether to bear a child with a genetic or other defect.
*See also Greco v. United States*, 111 Nev. 405, 893 P.2d 345, 348 n. 5 (1995) (explaining that "wrongful life" was originally a play on the statutory wrongful death action and recognizing the observation that "the net effect of these terms has been to 'spawn confusion' and distort or impair judicial vision."); *Lininger v. Eisenbaum*, 764 P.2d 1202, 1204 (Colo.1988) ("The use of the term[] ... 'wrongful birth' more often serves to obscure the issues than to elucidate them.").

7. *Grubbs v. Barbourville Family Health Center, P.S.C., supra* at 689 ("[W]e are unwilling

to equate the loss of an abortion opportunity *resulting in a genetically or congenitally impaired human life, even severely impaired* with a cognizable legal injury." (emphasis added)); *Id.* (Wintersheimer, J., concurring) at 693 ("It is also clear that any claim for wrongful birth should not be recognized because it requires that life itself constitute some kind of legal injury.").

8. *Smith v. Cote, supra* note 1 at 348.

9. *Lininger v. Eisenbaum, supra* note 6 at 1206.

10. *Garrison v. Medical Center of Delaware, Inc.*, 581 A.2d 288, 289 (Del.1989).

must be sufficient to enable her to make an informed and meaningful decision concerning whether or not to continue the pregnancy.

Compensable damages in a wrongful birth case include the emotional injury of the parents caused by the deprivation of "the option to accept or reject a parental relationship with the child . . . ." These damages also include the special medical expenses attributable to raising a child with a congenital impairment. Damages, however, do not encompass the birth defect or congenital impairment itself.[11]

Once the plaintiffs' injury is properly conceptualized as an invasion of their reproductive autonomy, the majority's conclusion that "a life cannot be an injury" is not relevant to an evaluation of the merits of their cause of action.[12] There is "no reason to hold that as a matter of law those who act negligently in providing [prenatal] care cannot cause harm"[13] because "[s]uch a holding would 'leave[ ] a void in the area of recovery for medical malpractice and dilute[ ] the standard of professional conduct' in a growing and increasingly important professional field."[14] In addition, a correct understanding of the plaintiff's legal injury: (1) exposes as non sequitur any concern about the inability to demonstrate a causal link between a physician's negligence and the child's abnormalities;[15] (2) helps to illustrate the types of damages that are available in such cases;[16]

**11.** *Canesi v. Wilson, supra* note 5 at 810–811 (citations omitted). *See also Smith v. Cote, supra* note 1 at 348 ("Although it involves an allegation of medical malpractice, it is not a claim arising from physical injury. It is instead based on a negligent invasion of the parental right to decide whether to avoid the birth of a child with congenital defects.").

**12.** *See Bader v. Johnson,* 732 N.E.2d 1212 (Ind.2000):

[In *Cowe v. Forum Group, Inc.,* 575 N.E.2d 630, 633 (Ind.1991)] we were unwilling to allow a child plaintiff to proceed with this cause of action, in part because it involved "a calculation of damages dependant upon the relevant benefits of an impaired life as opposed to no life at all ... a comparison the law is not equipped to make." Here, however, the injury is the lost opportunity and ability to terminate the pregnancy. Failure to allow the [plaintiffs] to proceed with their claim would "immunize those in the medical field from liability for their performance in one particular area of medical practice." (citations omitted).

**13.** *Smith v. Cote, supra* note 1 at 347.

**14.** *Id.* (citation omitted).

**15.** *See Greco v. United States, supra* note 6 at 349:

We also reject the ... argument that [plaintiff mother's] physicians did not cause any of the injuries that [she] might have suffered. We note that the mother is not claiming that her child's defects were caused by her physician's negligence; rather, she claims that her physician's negligence kept her ignorant of those defects and that it was this negligence which caused her to lose her right to choose whether to carry the child to term.

*See also Canesi v. Wilson, supra* note 5 at 818 ("The appropriate proximate cause question, therefore, is not whether the doctor's negligence caused the fetal defect; the congenital harm suffered by the child is expressly not compensable. Rather, the determination to be made is whether the doctors' inadequate disclosure deprived the parents of their deeply personal right to decide for themselves whether to give birth to a child who could possibly be afflicted with a physical abnormality."); *Keel v. Banach,* 624 So.2d 1022, 1029 (Ala.1993) ("The nature of the tort of wrongful birth has nothing to do with whether a defendant caused the injury or harm to the child, but, rather, with whether the defendant's negligence was the proximate cause of the parents' being deprived of the option of ... making an informed and meaningful decision either to terminate the pregnancy or to give birth to a potentially defective child.").

**16.** *See Smith v. Cote, supra* note 1 at 348 ("When parents are denied the opportunity to make this decision, important personal interests may be impaired, including an interest in avoiding the special expenses necessitated by

and (3) demonstrates that the trial court correctly dismissed the Grubbs parents' claim under KRS 413.140(1)(e) because it was filed more than one year after the plaintiffs discovered, prior to Carlei's birth, that their physicians had failed to inform them of Carlei's disabilities in time for them to make an election whether to terminate the pregnancy.[17]

"The law of Kentucky permits '[o]ne injured by the negligence of another ... to recover of him full compensation for all damages proximately caused from the negligence.' "[18] In their complaint, the Bogan parents sought compensation for: (1) pain and suffering and permanent scarring that Gretchen Bogan suffered as a result of the emergency caesarian section required to effect Nathan's delivery;[19] (2) "[p]resent and future damages relating to the cost of reasonable and necessary medical expenses, special care, and treatment for Nathan; (3) emotional suffering caused by the afflictions of Nathan"; and (4) "[l]ost wages and expenses due to the need for

one or both of Gretchen Bogan or Daniel Bogan to help care for Nathan[.]" Today, by misconstruing the nature of the Bogan parents' claim and holding, in effect, that no parent in the Bogans' position can demonstrate an injury necessary to prove a prima facie case for medical negligence, this Court's holding will prevent future parents in this position from recovering *any* tort damages for their physicians' negligence.

I question the relevance of the majority's observation that a divergence of opinion exists as to the proper measure of damages in such cases. I can find no warrant for the implicit suggestion that this Court must await nationwide "consensus" before we evaluate the compensation due to an injured Kentucky plaintiff. In any event, however, I would observe that in cases such as the one at bar "almost all courts have allowed the parents to recover against a negligent physician the extraordinary medical, educational, and other expenses that are associated with and are consequences of the disorder."[20] Allowing

the condition of a child born with defects ....").

17. Although the Grubbs parents did not know the full extent of their damages at this time, they were aware of their legal injury at the hands of their physicians, and the statute of limitations began running upon that discovery. KRS 413.140(2) ("[T]he cause of action shall be deemed to accrue at the time the injury is first discovered or in the exercise of reasonable care should have been discovered[.]"); *Wiseman v. Alliant Hospitals, Inc.,* Ky. 37 S.W.3d 709, 712 (2001) (" 'Injury,' ... is defined as 'the invasion of any legally protected interest of another.' Thus, injury in the medical malpractice context refers to the actual wrongdoing, or the malpractice itself.... Under the discovery rule, it is the date if the actual or constructive knowledge of the injury which triggers the running of the statute of limitations.").

18. *Smith v. McMillan,* Ky., 841 S.W.2d 172, 175 (1992) (quoting *Field Packing Co. v. Denham,* 342 S.W.2d 524, 526 (1961)).

19. Although the majority's ultimate holding is that the Bogan parents cannot prove a prima facie negligence case because they cannot demonstrate a cognizable legal injury, the majority acknowledges the law of the case implications present in the case at bar, which arose from the Bogan plaintiffs' appeal from the trial court's final order that had granted *partial* summary judgment to the defendants, but denied summary judgment as to this particular claim for damages. Accordingly, the majority remands the Bogan appeal to the trial court for "adjudication of their claim for pain and suffering and permanent scars suffered in connection with the caesarean section delivery," *Grubbs v. Barbourville Family Health Center, P.S.C., supra* at 691.

20. *Viccaro v. Milunsky, supra* note 6 at 10 (collecting cases). *See also James G. v. Caserta,* 175 W.Va. 406, 332 S.E.2d 872, 882 (1985) (collecting cases and observing that "[i]t is *generally recognized* that in a wrongful birth action, parents may recover the extraordinary costs necessary to treat the birth defect and

the recovery of extraordinary expenses associated with the defect avoids the philosophical objections to weighing quality of life and is consistent with public policy:

> The economic burden related solely to the physical defects of the child is a different matter which is free from the above objection [that courts cannot "measure life with defects against no life at all]." These expenses lie within the methods of proof by which courts are accustomed to determine awards in personal injury cases. No public policy obstacle should be interposed to that recovery. It is impossible for us to justify a policy which at once deprives the parents of information by which they could elect to terminate the pregnancy likely to produce a child with a defective body, a policy which in effect requires that the deficient embryo be carried to full gestation until the deficient child is born, and which policy then denies recovery from the tort-feasor of costs of treating and caring for the defects of the child.[21]

Although different jurisdictions have adopted different approaches to the recovery of emotional damages in such cases, a reasonable argument can be made that at least Gretchen Bogan could satisfy Kentucky's physical contact requirement for emotional damages recovery.[22] Finally, the Bogan parents' lost wages and other damages should be recoverable even under existing precedent.[23] Thus, I would allow the Bogan parents' claim to proceed to trial, and would permit them to recover any of the items of damages named in their complaint.

I will conclude this dissent where I began—by observing that the issue before us does not "requir[e] our decision of the public policy either for or against abortion."[24] Regardless of one's personal beliefs concerning the propriety or morality of eugenic abortion procedures, "[u]nder *Roe*, prospective parents may have constitutionally cognizable reasons for avoiding the emotional and pecuniary burdens that attend the birth of a child suffering from birth defects,"[25] and "[t]hose who do not wish to undertake the many burdens associated with the birth and continued care of such a child have the legal right ... to terminate their pregnancies."[26] The ma-

---

any additional medical or educational costs attributable to the birth defect[.]" (emphasis added)).

21. *Jacobs v. Theimer*, 519 S.W.2d 846, 849 (Tex.1975). *See also Smith v. Cote, supra* note 1 at 349 (explaining that the "extraordinary expenses only" remedy is premised on expectation damages authorized under contract law and avoids a windfall without requiring application of the benefit rule); *Lininger v. Eisenbaum, supra* note 6 at 1207.

22. *Deutsch v. Shein*, Ky., 597 S.W.2d 141 (1980). *See also Bader v. Johnson, supra* note 12 at 1222.

23. *See Schork v. Huber*, Ky., 648 S.W.2d 861 (1983) (denying recovery for "damages based on the costs of raising a healthy but unexpected child ... following an unsuccessful sterili-

zation procedure," in an appeal from a partial summary judgment that permitted the plaintiffs to proceed with other damage claims, e.g., "the mother's medical expenses, pain and suffering, and loss of earnings in connection with the child's birth."); *Maggard v. McKelvey*, Ky.App., 627 S.W.2d 44, 48 (1982) (holding, in a medical malpractice case involving an unwanted birth following a negligent vasectomy procedure, that "the damages are limited to the general and special damages incidental to the pregnancy and birth, such as, pain and suffering, loss of consortium, medical and hospital expenses, and loss of wages.").

24. *Jacobs v. Theimer, supra* note 21 at 848.

25. *Smith v. Cote, supra* note 1 at 347.

26. *Greco v. United States, supra* note 6 at 349.

 

jority and concurring opinions do not, of course, dispute the fact that under existing precedent the right of privacy found in the United States Constitution protects parents' reproductive choices. Nonetheless, by characterizing a parent's decision to terminate a pregnancy as elimination of the "unfit" or "defective" and alluding to Nazi-style eugenics programs, the majority and concurring opinions step outside the judiciary's proper role and inappropriately volunteer personal opinions regarding the morality of the choices that the Grubbs and Bogan parents say they would have made if their physicians had fully informed them. Moreover, the "tyranny of the slippery slope" argument implicitly referenced in today's concurring opinion[27] is by no means the exclusive province of those who trumpet the sanctity of life. As a countervailing perspective, I would offer Margaret Atwood's *The Handmaid's Tale*[28] as a powerful vision of the dystopia that could exist in a world where citizens' individual rights of procreative freedom are completely disregarded. In any event, "[t]he fact that this particular claim involves some moralistic and social overtones having to do with contraception and childbirth should not be permitted to become the handmaiden for the destruction of our established notions of tort law."[29] Issues like the one at bar are unquestionably difficult, but they demand careful analysis *within the framework of the law.* Personal ideology, which only adds to the difficulty by breeding additional and unnecessary divisiveness at the expense of the legal

questions before us, simply has no place in this analysis.

STUMBO, J., joins.

**27.** *Grubbs v. Barbourville Family Health Center, P.S.C., supra* at 692 (Wintersheimer, J., concurring) (*"If logically extended,* it could produce a culture that condones the extermination of the weak by the strong or the more powerful." (emphasis added)).

**28.** M. ATWOOD, THE HANDMAID'S TALE (1986).

**29.** *Beardsley v. Wierdsma,* 650 P.2d 288, 293 (Wyo.1982) (Rose, C.J., concurring specially).