MANSFIELD, Justice
(dissenting).
I respectfully dissent because I cannot agree that we should create a cause of action for “wrongful birth.”
Nothing compels us to establish a wrongful-birth cause of action. As plaintiffs’ very able counsel conceded at oral argument, Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), does not require this result. There is no constitutional imperative here.
In my view, the court’s decision is incorrect for three reasons. First, this cause of action did not exist at common law and is contrary to traditional common law concepts. Second, Iowa statutes, specifically Iowa Rule of Civil Procedure 1.206, foreclose this cause of action. Third, there are good public policy reasons not to recognize the claim. See Dier v. Peters, 815 N.W.2d 1, 3 (Iowa 2012) (citing and applying these three factors in determining whether Iowa tort law allows an action for paternity fraud).
I. Common Law Precedents Do Not Support This Claim.
The common law does not support this cause of action. At common law, parents could not recover for the wrongful birth of a child. See Etkind v. Suarez, 271 Ga. 352, 519 S.E.2d 210, 214 (1999); Hickman v. Grp. Health Plan, Inc., 396 N.W.2d 10, 13 (Minn. 1986); Wood v. Univ. of Utah Med. Ctr„ 67 P.3d 436, 442 (Utah 2002). This was true even though abortion was not illegal at common law. See Abrams v. Foshee, 3 Iowa 274, 278-80 (1856).
Furthermore, even if we were not constrained by Iowa statutes and could tinker with the common law in this area, there are good reasons not to do so. This is not a straight-and-simple case of medical malpractice, as the majority suggests. In general, a medical malpractice claim cannot be pursued in the absence of physical harm. See Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 6, at 67 (Am. Law Inst. 2010) (“An actor whose negligence is a factual cause of physical harm is subject to liability for any such harm within the scope of liability....”).
Plaintiffs do not contend that the defendants’ actions caused physical harm to Z— but rather that Z’s birth as a severely disabled child has caused them economic and emotional harm. In the plaintiffs’ words,
A baby such as Z.P. is not the injury. The injury is that the parents were denied the right to make a deeply personal but informed decision whether to give birth to a potentially severely brain damaged child and willingly incur the foreseeable economic and emotional costs associated with caring for such a child.
I do not minimize the financial and personal burdens on the Plowmans of raising a severely disabled child. But this is not a typical medical malpractice claim.
It is true we have allowed medical malpractice claims to be pursued in the absence of physical injury when a breach of duty will “inevitably” result in mental anguish, pain and suffering. See Oswald v. LeGrand, 453 N.W.2d 634, 639-40 (Iowa 1990) (limiting the holding to “a combination of the two factors existing here: extremely rude behavior or crass insensitivity coupled with an unusual vulnerability on the part of the person receiving professional services”); see also Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 47(b) & cmt. ƒ, at 175, 179 (Am. Law Inst. 2012) (allowing recovery for serious emotional harm in the context of “specified categories of activities, *416 undertakings, or relationships in which negligent conduct is especially likely to cause serious emotional harm” while noting that “the mere fact that serious emotional harm was foreseeable under the facts of the specific case” is insufficient). Yet even if one could argue for the Oswald exception here, plaintiffs’ lawsuit has clearly traveled some distance from a traditional medical malpractice claim.
My colleagues analogize the wrongful-birth claim to a failure-to-diagnose or a failure-to-provide-informed-consent cause of action. These off-base comparisons do not advance the majority’s analysis. Under a failure-to-diagnose claim, the physician can be sued because his or her negligence has resulted in physical harm, or at least greater physical harm than would otherwise have occurred. See, e.g,, Murtha v. Cahalan, 745 N.W.2d 711, 716 (Iowa 2008) (“[T]he ‘injury’ is the development of the problem into a more serious condition which poses greater danger to the patient or which requires more extensive treatment.” (emphasis omitted) (quoting De-Boer v. Brown, 138 Ariz. 168, 673 P.2d 912, 914 (1983) (en banc))). Similarly, the informed-consent theory permits a physician to be sued only when inadequate disclosure of the risks of a “proposed medical procedure” results in “injury.” See Pauscher v. Iowa Methodist Med. Ctr., 408 N.W.2d 355, 359-60 (Iowa 1987). Here, again, the alleged breach of duty has not caused physical harm.
II. This Claim Is Contrary to an Iowa Statute.
Furthermore, existing, longstanding Iowa legislation weighs against the creation of the wrongful-birth cause of action
and, in my view, forecloses it. In 1860, our legislature enacted what is now Iowa Rule of Civil Procedure 1.206. See Iowa Code § 2792 (1860); see also id. § 4187 (repealing in whole the 1851 Code of Civil Practice). The 1860 law provided,
A father, or in case of his death or imprisonment or desertion of his family, the mother, may prosecute as plaintiff an action for the expenses and actual loss of service resulting from injury or death of a minor child.
Iowa Code § 2792.
Other than amendments eliminating the preference for the father, this statute has remained basically unchanged for over 150 years.[15] And until now, we have adhered to its limits. For example, in 1926, we did not let a father recover for the wrongful death of a thirteen-year-old son who had been emancipated. Lipovac v. Iowa Ry. & Light Co., 202 Iowa 517, 522-23, 210 N.W. 573, 575-76 (1926). We explained that the father “must bring himself within [the statute’s] terms in order to be entitled to recover.” Id. at 519, 210 N.W. at 574 (recognizing that an action to recover under the statute “cannot be extended to cases omitted from its provisions or applied to those not fairly within its purview”). In 1971, we held that emotional distress damages were not recoverable because the statute was limited to “expense” and “loss of services.” See Wardlow v. City of Keokuk, 190 N.W.2d 439, 448 (Iowa 1971) (noting that recovery is “limited by the precise language of [the statute]”). We have also declined to allow parents to recover damages for injury or death of an adult child, reasoning, “The legislature has defined the remedies available for injury to or death of a person, and thus, any recov *417 ery is limited to those remedies provided by the legislature.” Kulish v. W. Side Unlimited Corp., 545 N.W.2d 860, 862 (Iowa 1996); see also Kuta v. Newberg, 600 N.W.2d 280, 287 (Iowa 1999) (denying recovery of consortium damages for an adult child under the statute even though “public policy might well support a different rule”).
In Dunn v. Rose Way, Inc., we held that a father could recover under this statute for the death of a viable unborn child. 833 N.W.2d 830, 833 (Iowa 1983). But we did so on the basis of close textual analysis of rule 1.206. We explained, “A minor person is simply one who has not yet reached majority, a category which certainly includes unborn persons.” Id,
Thus, to date, we have respected the boundaries of rule 1.206. Under this statute, parents cannot sue for emotional distress because the statute is limited to recovery of expenses and loss of services. Likewise, until the law was changed, parents could not sue for the injury or death of an adult child under rule 1.206 because it only referehced minor children.[16] And while parents can sue for the death of an unborn child, this is only because we have concluded an unborn child fits within rule 1.206’s definition of a minor child.
Rule 1.206 thus controls a parent’s right to recover for tortious conduct affecting a minor child. See Wardlow, 190 N.W.2d at 443; see also Dunn, 333 N.W.2d at 833 (“What is involved here is a right of recovery given to a parent.”). And the statute limits recovery to circumstances when there is an “injury to” or the “death of’ a minor child. No part of rule 1.206 authorizes recovery for a child’s birth. Consistent with our prior cases, we should continue to honor the legislative lines that rule 1.206 has drawn. Because the statute includes “injury” and “death” but not “birth,” parents may recover for an injury to a minor child or the death of a minor child, but not for the minor child’s birth. Otherwise, we would be rewriting the statute.
The court says that rule 1.206 does not “speak to” the wrongful-birth cause of action because such a claim does not involve injury to the minor child. However, by the same logic, we could just as well have said that rule 1.206 does not “speak to” claims relating to adult children or claims for emotional distress damages. We didn’t. Under the interpretive canon expressio unius est exelusio alterius, the legislature’s decision to include recovery for “injury to” or “death of’ a minor child also means-it did not intend to include recovery for the birth of a child. See Homan v. Branstad, 887 N.W.2d 153, 166 (Iowa 2016) (“It is an established rule of statutory construction that ‘legislative intent is expressed by omission as well as by inclusion, and the express mention of one thing implies the exclusion of others not so mentioned.’” (quoting Marcus v. Young, 538 N.W.2d 285, 289 (Iowa 1995)).) This rule of construction has special force here given that a wrongful-birth cause of action has no footing in-traditional common law.
III. Public Policy Considerations Should Also Defeat This Claim.
Finally, there are valid public policy reasons not to recognize this claim. It goes without saying that a main source of public *418 policy should be the enactments of the public’s representatives, namely the legislature. See Berry v. Liberty Holdings, Inc., 803 N.W.2d 106, 110-11 (Iowa 2011) (discussing public policy in the context of a wrongful-discharge claim). Unless a public policy is “clear and apparent,” “public policy is best left to our legislative branch of government to decide as representatives of the people.” Galloway v. State, 790 N.W.2d 252, 259 (Iowa 2010) (Cady, J., dissenting).
Bowing to this approach in part, the court cites recent informed-consent laws relating to abortion as reflective of legislative policy. However, the last time the Iowa legislature was actually free to set policy in this area predated Roe v. Wade. At that time the legislature made performing an abortion illegal, except to save the life of the mother. See Iowa Code § 701.1 (1973).[17] An honest appraisal of the legislature’s Iowa Code section 146A.1 would And that it is intended to discourage, not encourage, abortions. The statute sets forth prerequisites for abortion only, not for carrying a pregnancy to term. See Iowa Code § 146A.1 (2017). It requires some creativity to read section 146A.1 as support for the new cause of action the court establishes today.[18]
Also relevant from a public policy perspective are the consequences of a particular ruling. See, e.g., Mulhern v. Catholic Health Initiatives, 799 N.W.2d 104, 121-22 (Iowa 2011). In my view, the court’s ruling leads to a slippery slope. True, today’s decision is limited to a “severely disabled child.” But the court does not define the term. What if testing indicates the child will be born blind or without a hand? Is that enough?
The court’s decision also opens up the possibility for other claims. Can a mother sue a father for not telling her that he carried a genetic disorder, on the theory that she would otherwise have had an abortion? Can a father sue a mother for not telling him she carried a genetic disorder, on the theory that he would not have had unprotected sex? Can a couple that relies on an outside sperm donor sue the source of that donation in tort?
Or suppose a physician recommends a potentially life-saving course of treatment for a seriously ill octogenarian whose adult children hold medical power of attorney. The children agree to the course of treatment, which prolongs the octogenarian’s life but doesn’t alleviate his misery. Instead, it drains the remaining assets of his *419 estate. The majority opinion opens up the possibility that the children could sue for “wrongful prolonging of life.”
Another unanswered question is how one will select a jury in a wrongful-birth case. Many Iowans have deep-seated moral and religious objections to abortion, even if the unborn child has a severe disability. This raises the specter of a highly intrusive and uncomfortable voir dire, leading to the exclusion of a large swath of our population from the jury panel. See Thornhill v. Midwest Physician Ctr. of Orland Park, 337 Ill.App.3d 1034, 272 Ill.Dec. 432, 787 N.E.2d 247, 257 (2003) (“The court excused 11 potential jurors based upon their opinions regarding abortion.”); Wuth ex rel. Kessler v. Lab. Corp. of Am., 189 Wash.App. 660, 359 P.3d 841, 852 (2015) (“Juiy selection began on October 21, 2013. On the Wuths’ motion, the trial court employed a written juror questionnaire and individual questioning of some prospective jurors to determine whether they were able to render an impartial verdict. The questionnaire asked whether the prospective jurors believed abortion is morally wrong or should be illegal, whether they had close contact with a disabled child, whether they had been a party to medical negligence lawsuit and whether they knew any of the parties. Jurors who responded affirmatively to any of the questions were brought in for individual questioning.”).
The best argument the court has for its ruling is that it provides greater motivation for physicians to provide more accurate diagnoses of conditions in unborn children. I agree that courts should take incentives into account in deciding cases, particularly under the common law. I also agree that traditional tort law works well and does a good job of internalizing the costs of negligent conduct. Yet I question whether the majority’s incentive is needed or beneficial here. In a typical medical malpractice case, the causation inquiry is a scientific one: Did the physician’s negligence cause the injury? Here, though, the causation inquiry is a human one: If the risks of a disability had been accurately disclosed, would the woman have terminated her pregnancy? Given the type of causation inquiry the factfinder must resolve, there is a possibility of overdeter-renee. Although this matter is not part of the present appeal, it is a subject of disagreement among the parties, with the defendants pointing out that the plaintiff declined her physician’s offer of amniocentesis during a subsequent pregnancy.
I would have no problem with a potential breach of contract claim against a physician who contractually assumes a duty to provide a competent diagnosis of an unborn child’s condition. Parties are today free by private arrangement to allocate this responsibility. This could also avoid any question as to what course of action would have been taken and eliminate the possible overdeterrence problem I have mentioned in the preceding paragraph.
As the Kentucky Supreme Court noted when it rejected the wrongful-birth cause of action,
The Bogans believe that patients should have a breach of contract action against the physicians who offered and charged for diagnostic prenatal testing, yet who allegedly did not perform those services correctly. Despite our holding denying the tort claim as a matter of law, a physician who contracts and charges for a service, such as a prenatal ultrasound and consequent opinion as to the results of the ultrasound, is liable for any breach of contract in this regard.
Grubbs ex rel. Grubbs v. Barbourville Family Health Ctr., P.S.C., 120 S.W.3d 682, 691 (Ky. 2003).
*420 IV. Conclusion.
For all these reasons, I would affirm the grant of summary judgment and let the general assembly decide whether to authorize this cause of action.[19]

. In 1973, the legislature eliminated the paternal preference. See 1973 Iowa Acts ch. 316, at 660. Current Iowa Rule of Civil Procedure 1.206 provides, "A parent, or the parents, may sue for the expense and actual loss of services, companionship and society resulting from injury to or death of a minor child.”

. In 2007, the legislature enacted a new statute, which provided,
A parent or the parents of a child may recover for the expense and actual loss of services, companionship, and society resulting from injury to or death of a minor child and may recover for the expense and actual loss of services, companionship, and society resulting from the death of an adult child.
2007 Iowa, Acts ch. 132, §: 1 (codified at Iowa Code § 613.' 15A (2011)).

. The legislature first criminalized the performance of any abortion in 1859. See 1859 Iowa Acts ch. 58, § 1 (codified at Iowa Code § 4221 (1860)). Aside from renumbering and minor changes, the statute remained unchanged until it was substantially amended in 1977 following Roe v. Wade. See 1976 Iowa Acts ch. 1245, ch. 4, § 526 (repealing Iowa Code § 701.1 (1977)); id. ch. 1245, ch. 1, § 707 (enacting Iowa Code § 707.7 (1979)).

. Section 146A.1 is entitled "Prerequisites for an abortion,” and at the time of the alleged malpractice read as follows;
Except in the case of a medical emergency, as defined in section 135L.1, for any woman, the physician shall certify both of the following before performing an abortion:
1. That the woman has been given the opportunity to view an ultrasound image of the fetus as part of the standard of care.
2. That the woman has been provided information regarding the options relative to a pregnancy, including continuing the pregnancy to term and retaining parental rights following the child's birth, continuing the pregnancy to term and placing the child for adoption, and terminating the pregnancy.
Iowa Code § 146A.1. In the 2017 session, the legislature added more prerequisites for an abortion, including a seventy-two hour waiting period. See S.F. 471, 87th G.A., 1st Sess. § 1 (Iowa 2017) (to be codified at Iowa Code § 146 A. 1(1)).

, The majority puts the shoe on the other foot, stating, "If the legislature disagrees with our decision, it is free to enact a statute precluding wrongful-birth claims.” This observation is undoubtedly true. In several states, legislatures have enacted statutes to overturn court decisions permitting wrongful-birth claims. See, e.g., Blake v. Cruz, 108 Idaho 253, 698 P.2d 315, 320-21 (1984), superseded by statute, Idaho Code Ann. § 5-334(1) (West, Westlaw current through laws enacted as of Jan. 18, 2017), as recognized in Vanvooren v. Astin, 141 Idaho 440, 111 P.3d 125, 127-28 (2005). However, I would not impose that burden on the Iowa General Assembly. In our system of government, it is the legislature’s job, not ours, generally to take the initiative on matters of public policy.